IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

FRANK C. CARLUCCI III,          )
                                )
     Plaintiff,                 )
                                )
          v.                    )    1:12cv451 (JCC/TCB)
                                )
MICHAEL S. HAN, *et al.*,        )
                                )
     Defendants.                )

# M E M O R A N D U M   O P I N I O N

This matter is before the Court on Defendants Michael Han ("Han") and Envion, Inc.'s ("Envion") (collectively, "Defendants") Motion to Dismiss (the "Motion") [Dkt. 10].  For the following reasons, the Court will grant Defendants' Motion.

## I. Background

This case arises out of allegations that Defendants engaged in securities fraud.

### A.   Factual Background

In approximately 2003, Plaintiff Frank Carlucci III ("Carlucci") met Defendant Michael Han at the Regency Sport and Health Club, where they both regularly played tennis.  (Compl. ¶ 12.)  Shortly thereafter, in early 2004, Han solicited an investment from Carlucci in his company, Defendant Envion, Inc. (Compl. ¶ 13.)  Han described Envion as a "technology company" that would "bring technology [he] owned to the United States

1

that his uncle had developed in Korea." (*Id.*)  Han described

that technology as "a patented process involving the conversion

of plastic waste into oil." (*Id.*)

Through a series of telephone calls and face-to-face

meetings at Carlucci's residence and the Regency Sport and

Health Club, Han allegedly made misrepresentations and omissions

of material fact relating to Envion. (Compl. ¶ 14.)  These

alleged misrepresentations included the following: (1) that Han

and Envion owned the exclusive patent rights in their Envion Oil

Generator technology, which formed the foundation for Envion's

business and success; (2) that Han had lined up the investment

banking house, Allen & Company, to raise funds for Envion and

that Allen & Company would be an equity investor in the company;

(3) that Han had communicated with numerous other investors who

were interested in investing in Envion, including Warren Buffet,

Bill Gates, Dow Chemical, Morgan Stanley, and Goldman Sachs; (4)

that, along with Han, Envion was run by a number of "seasoned

and highly regarded executives with extensive track records of

success in the energy, technology, and finance industries, as

well as the public sector"; (5) that Han was negotiating a

lucrative arrangement with Waste Management Company pursuant to

which Waste Management would purchase rights to use Envion's

technology; (6) that Han was negotiating a lucrative arrangement

with Allied Republic, another waste management company and a

2

competitor of Waste Management; (7) that Envion had a backlog of orders for its Oil Generator product; and (8) that for each of these reasons, Envion would provide the best return Carlucci had received on any investment. (Compl. ¶¶ 14(a)-(g).) On March 4, 2004, in reliance on these alleged misrepresentations, Carlucci made an investment in Envion in the amount of $500,000. (Compl. ¶ 16.) The investment was in the form of a convertible promissory note, which Carlucci could convert at any time into Envion common stock. (*Id.*)

Over the next several years, Han approached Carlucci for additional investments in Envion. (Compl. ¶¶ 17-19.) On each occasion, Han allegedly misrepresented Envion's business prospects. (Compl. ¶ 17.) For example, Han represented that Envion had exclusive patent rights in its critical technology and that Envion had many favorable business arrangements that would generate an enormous return on any investment that Carlucci made. (*Id.*) From November 2004 through April 2010, Carlucci invested an additional $11,593,000 in Envion. (Compl. ¶ 18.) Each investment was evidenced by a convertible promissory note that accrued interest in the range of 8% to 10% annually and could be converted at any time into Envion common stock. (Compl. ¶ 19.)

In or around September and October 2010, Han approached Carlucci for a $20 million investment. (Compl. ¶

3

20.)  Through a series of face-to-face meetings at Carlucci's
residence, Han allegedly made additional misrepresentations to
Carlucci, which included the following: (1) that Envion had a
"done deal with Gazprom," one of the world's largest gas
companies, pursuant to which Gazprom would invest millions in
Envion in exchange for a 49% ownership interest and Han would
become the CEO of Gazprom's wholly-owned waste disposal
subsidiary (which would fully utilize Envion's technology); (2)
that Envion was close to a "deal" with Petrobas, a Brazilian
energy company, which consisted of two parts: (i) an off-take
agreement, under which Envion would provide Envion Oil
Generators to Petrobas; and (ii) a joint venture, under which
Petrobas would invest "substantial sums of money" in Envion; (3)
that, because a sizeable investment from Gazprom was a "done
deal," Carlucci would get his investment back "in three weeks";
(4) that Envion had a "backlog of 2,000 orders" for its Envion
Oil Generators; (5) that Carlucci's $20 million investment would
be used exclusively for two purposes: (i) for Envion to buy out
Han's uncle, who was becoming anxious to realize an immediate
return on his investment in Envion, and (ii) as investment
capital for Envion's legitimate business purposes; and (6) that
Envion owned the exclusive patent rights in its Envion Oil
Generator technology.  (Compl. ¶¶ 20(a)-(f).)

Han also assured Carlucci that "Envion would be the best return [he] would receive on any investment," possibly up to "50 times" the amount he had invested. (Compl. ¶ 22.)  To support this representation, Han had previously presented Carlucci with a projection of the return he would receive. (*Id.*)  In connection with Han's solicitation of the $20 million investment, Carlucci asked if the projection was still valid. In response, Han allegedly stated "Yes, it is." (*Id.*) According to Carlucci, no cautionary language, qualifications, or conditions accompanied the projection. (*Id.*)  In reliance on these alleged misrepresentations, Carlucci invested $20 million in Envion, as evidenced by a convertible promissory note dated October 10, 2010. (Compl. ¶ 23.)  The note accrued interest at an annual rate of 8% and could be converted at any time into Envion common stock. (*Id.*)

Around the same time Carlucci made the $20 million investment, Han allegedly moved Envion from Washington, D.C. to Florida and purchased a home in Florida valued at $3.5 million. (Compl. ¶¶ 24(a)-(b).)  Carlucci also alleges on information and belief that Han provided himself with a $5 million salary. (Compl. ¶ 24(c).)

In August of 2011, Carlucci's prior investments were "rolled into" one convertible promissory note in the amount of

$32,393,000 (hereinafter, the "August 2011 note").[1]  (Compl. ¶
25.)  In connection with the issuance of the August 2011 note,
Han and Carlucci had several face-to-face meetings at Carlucci's
residence, the Regency Sport and Health Club, and at Carlucci's
office in Washington, D.C.  (Compl. ¶ 26.)  During these
meetings, Han allegedly reasserted that Carlucci would receive a
return on his investment of possibly 50 times the amount
invested due to the "done deal" with Gazprom and other deals
that he had obtained or was in the process of obtaining,
including that with Petrobas.  (Compl. ¶ 26(a).)  Han also
repeated that Envion owned the exclusive patent rights in its
Envion Oil Generator technology.  (Compl. ¶ 26(c).)  Han
allegedly assured Carlucci that his investment had been used
exclusively for Envion's legitimate business purposes, including
the "buy out" of Han's uncle.  (Compl. ¶ 26(b).)  And finally,
Han allegedly represented that former President Bill Clinton had
agreed to affiliate himself with Envion, possibly as a member of
its board of directors, and that former President George W. Bush
was interested in investing in Envion.  (Compl. ¶ 27.)

        Carlucci alleges that each of the representations Han
made was false, and that Han knew or should have known that they
were false at the time he made them.  (Compl. ¶¶ 15, 17, 21,
28.)  He further alleges that he reasonably relied on each of

---

[1] The sixteen notes which were rolled into the August 2011 note are
collectively referred to herein as "the pre-consolidation notes."

Han's misrepresentations and omissions of material fact in deciding to invest in Envion.  (Compl. ¶¶ 15, 17, 21, 28.)

Carlucci began to suspect that Han's representations were false and/or that he had omitted material facts in March 2012.  (Compl. ¶ 30.)  Specifically, an energy consultant who traveled with Han to Brazil informed Carlucci that Envion had no joint venture with Petrobas, and that there was no reasonable basis for concluding that a joint venture would materialize.  (Compl. ¶ 31.)  This information caused Carlucci to engage in further investigation of Han and Envion.  (Compl. ¶ 32.)  As a result of that investigation, Carlucci learned that (1) Defendants did not own the exclusive patent rights in the Envion Oil Generator technology; (2) Defendants did not use Carlucci's $20 million investment to buy out Han's uncle or for legitimate business purposes; rather Han used the funds to move the company to Florida and to buy a house; (3) Envion had not reached any "deal" with Gazprom or Petrobas; (4) on information and belief, Envion did not have a backlog of 2,000 orders for its Oil Generator product; (5) none of the high-profile investors, such as Warren Buffet and Bill Gates, had invested in Envion; (6) former President Bill Clinton had no affiliation with Envion nor had former President George W. Bush expressed an interest in investing in Envion; and (7) Envion was on the brink of insolvency.  (Compl. ¶¶ 32(a)-(g).)

Upon learning this information, Carlucci requested that Han allow an accountant to audit Envion's books, records, and intellectual property.  (Compl. ¶ 33.)  Han allegedly refused, and instead responded that he was too busy.  (*Id.*)  Carlucci alleges that as a direct and proximate result of Defendants' conduct, he has been damaged in an amount no less than $32,393,000.  (Compl. ¶ 34.)

B.   Procedural Background

Plaintiff filed suit in this Court on April 24, 2012. [Dkt. 1.]  Plaintiff asserts four causes of action:  (1) securities fraud in violation of Section 10(b) of the Securities and Exchange Act of 1934 (the "'34 Act"), 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 (Count I);[2] (2) securities fraud in violation of the Virginia Securities Act, Va. Code § 13.1-501, *et seq.* (Count II); (3) actual fraud (Count III); and (4) constructive fraud/negligent misrepresentation (Count IV).  Federal jurisdiction is based on federal question jurisdiction pursuant to 28 U.S.C. § 1331, diversity jurisdiction pursuant to 28 U.S.C. § 1332, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

On June 8, 2012, Defendants filed a Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b)

---

[2] Because the scope of Rule 10b-5 is coextensive with the coverage of Section 10(b), the Court will use "Section 10(b)" to refer to both the statute and the rule.  *See SEC v. Pirate Investor, LLC*, 580 F.3d 233, 237 n.1 (4th Cir. 2009) (citations omitted).

and the Private Securities Litigation Reform Act of 1995

("PSLRA"), 15 U.S.C. § 78u-4(b).  [Dkt. 10.]  Plaintiff filed

his opposition on July 9, 2012, [Dkt. 32], to which Defendants

replied on July 17, 2012, [Dkt. 34].

Defendants' Motion is before the Court.

## II.  Standard of Review

### A.   Rule 12(b)(6)

Rule 12(b)(6) allows a court to dismiss those

allegations which fail "to state a claim upon which relief can

be granted."  Fed. R. Civ. P. 12(b)(6).  A Rule 12(b)(6) motion

tests the legal sufficiency of the complaint.  *Giarratano v.*

*Johnson*, 521 F.3d 298, 302 (4th Cir. 2008).  A court reviewing a

complaint on a Rule 12(b)(6) motion must accept well-pleaded

allegations as true and must construe factual allegations in

favor of the plaintiff.  *See Randall v. United States,* 30 F.3d

518, 522 (4th Cir. 1994).  In addition to the complaint, the

Court may consider documents integral to and explicitly relied

on in the complaint if the plaintiff does not challenge their

authenticity.  *Am. Chiropractic Ass'n v. Trigon Healthcare,*

*Inc.*, 367 F.3d 212, 234 (4th Cir. 2004).  The Court may also

take judicial notice of matters of public record.  *Philips v.*

*Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

To survive a motion to dismiss, "a complaint must

contain sufficient factual matter, accepted as true, to 'state a

claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  To meet this standard, a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do."  *Twombly*, 550 U.S. at 555.  "Factual allegations must be enough to raise a right to relief above the speculative level . . . ."  *Id.*  Moreover, a court "is not bound to accept as true a legal conclusion couched as a factual allegation."  *Iqbal*, 556 U.S. at 678.

     B.   Rule 9(b)

Rule 9(b) imposes a heightened pleading standard for fraud claims.  "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  To satisfy the heightened pleading standard of Rule 9(b), a plaintiff must state with particularity "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby."  *In re Mut. Funds Inv. Litig.*, 566 F.3d 111, 120 (4th

Cir. 2009) (quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999)), *rev'd sub nom. on other grounds Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S.Ct. 2296 (2011).

C.   PSLRA

A plaintiff asserting a securities fraud claim pursuant to Section 10(b) must meet the pleading requirements of Rule 9(b) as well as those imposed by the PSLRA.  *Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs*, 432 F. Supp. 2d 571, 578 (E.D. Va. 2006).  The PSLRA requires a plaintiff to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omissions is made on information and belief, . . . state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).  The PSLRA also requires that the plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," *i.e.*, scienter.  *Id.* § 78u-4(b)(2).  Specifically, the plaintiff must "plead facts rendering an inference of scienter *at least as likely as* any plausible opposing inference."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 328 (2007) (emphasis in original).

### III. Analysis

First, Defendants contend that all of Carlucci's claims should be dismissed because he has not incurred any damages. Second, they argue that Carlucci cannot state a claim as to any of the pre-consolidation notes because, when those notes were rolled into the August 2011 note, he necessarily recouped his entire investment. They also assert that certain of these notes are non-actionable because they have maturities shorter than nine months and do not qualify as "securities." Next, Defendants argue that portions of Carlucci's claims are time-barred. And finally, Defendants argue that each claim should be dismissed in its entirety due to various pleading deficiencies. The Court will address each argument in turn.

A.   Damages

Defendants argue that all of Carlucci's claims should be dismissed because Carlucci has not shown that he has suffered any damages. According to the Complaint, the sixteen notes Carlucci purchased between March 2004 and October 2010 were later rolled into one note in August 2011. The Complaint does not allege that the August 2011 note has matured, or that Defendants have failed to make any payments due. From this, Defendants contend that, even accepting as true Carlucci's allegations that Defendants made misrepresentations in connection with the August 2011 note, those misrepresentations

12

did not leave Carlucci in any worse position than he otherwise would have been.

The measure of damages in a Section 10(b) case is the difference between the value of the consideration paid and the value of the securities received. *See Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 155 (1972); *see also Diaz Vicente v. Obenauer*, 736 F. Supp. 679, 694 (E.D. Va. 1990) (holding that plaintiff who purchased worthless securities was entitled to damages equal to the amount invested on Virginia common law fraud claim).[3]  The Virginia Securities Act, meanwhile, allows a plaintiff to recover the "consideration paid for [a] security, together with interest thereon . . . , costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of such security, or for the substantial equivalent in damages if he no longer owns the security."  Va. Code § 13.1-522(A).

Contrary to Defendants' argument, the August 2011 note need not mature, and Defendants need not miss a payment due, for Carlucci to have incurred damages.  Rather, if the notes were worth less than represented at the time Carlucci purchased them, then he has suffered a cognizable injury which can support his

---

[3] The Court must apply the choice of law rules of the state in which it sits. *Klaxon v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496-97 (1941).  With respect to tort claims, Virginia selects the law of the place of the wrong, *i.e.*, where the tortious conduct took place.  *Milton v. IIT Research Institute*, 138 F.3d 519, 522 (4th Cir. 1998).  Because Defendants' allegedly fraudulent acts occurred chiefly in Virginia, the Court applies Virginia law to Carlucci's tort claims.  *See Diaz Vicente*, 736 F. Supp. at 690.

claims.  *See Diaz Vicente,* 736 F. Supp. at 694; *see also Am.
Home Assurance Co. v. Dykema, Gossett, Spencer, Goodnow & Trigg*,
811 F.2d 1077, 1086-87 (7th Cir. 1987) (holding that "the
plaintiffs were undeniably injured at the time they bought notes
and securities worth much less than represented").[4]  Moreover,
Carlucci need not realize losses before bringing his claims.
*See Varghese v. China Shenguo Pharms. Holdings, Inc.*, 672 F.
Supp. 2d 596, 611 (S.D.N.Y. 2009) (noting the "decades of
precedent both before and after the enactment of the PSLRA"
concluding that a plaintiff who holds securities at the time of
suit may bring claims for securities fraud).  For these reasons,
Defendants' argument is meritless.[5]

---

[4] As an aside, many defendants in the recent wave of mortgage-backed
securities litigation have raised a similar argument (most often in the
context of claims brought under the Securities Act of 1933 ("the '33 Act"))
as that made here -- namely that a purchaser of securities has not suffered
damages if the securities at issue continue to pay the principal and interest
due.  Courts have routinely rejected this argument.  *See, e.g., Plumbers' &
Pipefitters' Local No. 562 Supplemental Plan v. J.P. Morgan Acceptance Corp.
I*, No. 08cv1713, 2012 WL 601448, at *8 (E.D.N.Y. Feb. 23, 2012) (involving
claims brought under Sections 11 and 12(a)(2) of the '33 Act); *N.J.
Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, No. 08-cv-5653, 2010 WL
1473288, at *4-5 (S.D.N.Y. Mar. 29, 2010) (same); *Thrivent Fin. for Lutherans
v. Countrywide Fin. Corp.*, No. 11-cv-7154, 2012 WL 1799028, at *2 (C.D. Cal.
Feb. 17, 2012) (involving Minnesota common law fraud claim); *Allstate Ins.
Co. v. Countrywide Fin. Corp.*, 824 F. Supp. 2d 1164, 1188 (C.D. Cal. 2011)
(involving New York common law fraud claim).  A Section 11 claim, like
Section 10(b) and common law fraud claims, allows a plaintiff to recover
damages based on value differential.  *See* 15 U.S.C. § 77k(e) (allowing a
plaintiff to "recover such damages as shall represent the difference between
the amount paid for the security . . . and (1) the value thereof as of the
time such suit was brought. . . .").  And, Section 12(a)(2) and the Virginia
Securities Act provide nearly identical remedies.  *See id.* § 77*l*(a) (allowing
a plaintiff to "recover the consideration paid for such security with
interest thereon, less the amount of any income received thereon, upon the
tender of such security, or for damages if he no longer owns the security.")
[5] To clarify, the Court does not determine here that Carlucci has adequately
pled economic loss and loss causation, required elements of his Section 10(b)
claim.  Rather, the Court merely concludes that Carlucci is not, as a

14

B.   Pre-Consolidation Notes

As Defendants point out, the sixteen notes Carlucci purchased between March 2004 and October 2010 were later rolled into one note with a face value of $32,393,000.  On this basis, Defendants contend that Carlucci necessarily recouped his entire investment in the pre-consolidation notes, and that those notes cannot support any of his claims.  This argument fails for several reasons.

First, the face value of the August 2011 note does not in itself demonstrate that Carlucci recovered his entire investment in the pre-consolidation notes.  While the August 2011 note has a face value of $32,393,000, it does not follow that its actual value is or was the same as its face value.  The actual value of a note is dependent on the issuer's ability to repay.  And if Defendants' ability to repay had deteriorated at the time the August 2011 note issued, its actual value could have been substantially less than that of the pre-consolidation notes.  Moreover, the Complaint alleges that the interest rate on the August 2011 note (5%) was lower than the interest rates on the pre-consolidation notes (ranging from 8% to 10%). (Compl. ¶¶ 19, 25.)  This further demonstrates that the August 2011 note was not the mere equivalent of the pre-consolidation notes, as Defendants suggest.  Finally, to the extent the August

threshold matter, precluded from bringing suit if the August 2011 note has not matured and Defendants have not missed a payment due.

2011 note extended the maturities of the pre-consolidation notes (some of which apparently had maturities shorter than nine months), the consolidation could entail a significant change in investment risk. *Cf. Pollack v. Laidlaw Holdings, Inc.*, No. 90-cv-5788, 1995 WL 261518, at *8 (S.D.N.Y. May 3, 1995) ("At the point just prior to maturity, the risk level of the mortgage is dependent solely on the ability of the mortgagee to pay the principal at that moment. At the point just after the rollover, the risk level is dependent on the solvency of the mortgagee over the entire period of the mortgage.") For these reasons, the Court rejects Defendants' argument that the pre-consolidation notes cannot support any of Carlucci's claims.

## C.   Short-Term Notes

Defendants also argue that Carlucci may not assert a Section 10(b) claim as to any note with a maturity less than nine months.[6] Section 3(a)(10) of the '34 Act excludes from the definition of "security" "any note . . . which has a maturity at the time of issuance not exceeding nine months." 15 U.S.C. § 78c(a)(10). Other circuits have been unanimous in limiting the

---

[6] In arguing that these notes are non-actionable, Defendants ask the Court to consider a copy of the note issued to Carlucci on April 1, 2007, which indicates a maturity date of June 1, 2007. (*See* Defs.' Mem. Ex. A.) Because the notes are "explicitly relied upon in the complaint," the Court may consider the April 1, 2007 note, as Carlucci does not contest its authenticity. *See Iron Workers*, 432 F. Supp. 2d at 577; *see also Salameh v. Tarsadia Hotels*, No. 09-cv-2739, 2010 WL 2839013, at *4 (S.D. Cal. July 20, 2010) (considering promissory notes integral to plaintiffs' claims on a Rule 12(b)(6) motion).

short-term note exception to commercial paper.[7]  *See Reves v.
Ernst & Young*, 494 U.S. 56, 74 (1990) (Stevens, J. concurring)
("The Courts of Appeal have been unanimous in rejecting a
literal reading of that exclusion"); *SEC v. R.G. Reynolds
Enters., Inc.*, 952 F.2d 1125, 1132 (9th Cir. 1991) (agreeing
with other circuits that "logic and legislative history favor
limiting the short-term note exception to commercial paper . . .
.") (collecting cases from the Second, Fifth, Seventh, Tenth,
and D.C. Circuits).  Defendants offer no reason to depart from
this unanimous persuasive precedent, nor any reason why the
short-term notes in this case should be considered commercial
paper.

     In their reply brief, Defendants proceed to argue that
the notes fail to qualify as "securities" under the "family
resemblance test" adopted by the Supreme Court in *Reves*.[8]  *See
Reves*, 494 U.S. at 64-67.  Under this test, every note is
presumed to be a "security."  *Id.* at 65.  This presumption can
be overcome, however, under either step of a two-tiered

---

[7] Commercial paper is a "short-term, high quality instrument[] issued to fund
current operations and sold only to highly sophisticated investors." *Reves
v. Ernst & Young*, 494 U.S. 56, 70 (1990).

[8] Defendants frame their argument incorrectly.  According to Defendants, some
courts have held that a note with a maturity less than nine months "can still
be a security under the 'family resemblance' test . . . ."  (Reply [Dkt. 34]
at 14.)  Contrary to Defendants' suggestion, a plaintiff need not
affirmatively invoke the family resemblance test to demonstrate that such a
note is a security.  *Cf. UBS Asset Mgmt. (N.Y.) Inc. v. Wood Gundy Corp.*, 914
F. Supp. 66, 68-69 (S.D.N.Y. 1996) (noting that the Section 3(a)(10)
exception applies to "prime quality commercial paper," and rejecting the
defendant's argument that plaintiffs failed to state a Section 10(b)
claim based on short-term debt securities without reference to *Reves* or the family
resemblance test).  Whether a note passes the family resemblance test is a
separate question, potentially relevant to notes of all maturities.

analysis. In the first step, courts are to compare the note in question to the several types of notes that the Supreme Court has specifically stated are not securities. *Id.* These include notes delivered in consumer financing, notes secured by a mortgage on a home, short-term notes secured by a lien on a small business or some of its assets, notes evidencing a character loan to a bank customer, short-term notes secured by an assignment of accounts receivable, notes which simply formalize an open-account debt incurred in the ordinary course of business, and notes evidencing loans by commercial banks for current operations. *Id.* When making this comparison, courts are to consider the following four factors: (1) the parties' motivations for entering into the transaction; (2) the plan of distribution of the instrument; (3) the reasonable expectations of the investing public; and (4) whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering the application of the Securities Acts unnecessary. *Id.* at 66-67. If a strong resemblance is not found, the court then moves on to step two, which is deciding whether a new category should be added to the list. *Id.* at 67.

Applying the family resemblance test, it is clear that the notes in this case are "securities." First, Carlucci's motivation was to make a profit and Defendants' purpose in

18

selling the notes was, in addition to buying out Han's uncle, for Envion's "legitimate business purposes," and hence general use.  *Id.* at 66.  While the notes do not appear to have been offered to a broad segment of the public, "[a] debt instrument may be distributed to but one investor, yet still be a security." *Tr. Co. of La. v. N.N.P., Inc.*, 104 F.3d 1478, 1489 (5th Cir. 1997) (citing *Nat'l Bank of Yugoslavia v. Drexel Burnham Lambert, Inc.*, 768 F. Supp. 1010, 1015-16 (S.D.N.Y. 1991)).  As for the third factor, the Complaint alleges that Han approached Carlucci soliciting investments, (*see* Compl. ¶¶ 17, 20), and thus the notes would have been construed accordingly by a reasonable investor.  Moreover, the notes were convertible into Envion common stock, which also militates in favor of finding the notes "securities." *Simmons Invs., Inc. v. Conversational Computing Corp.*, No. 09-cv-2345, 2011 WL 673759, at *5 (D. Kan. Feb. 17, 2011).  And, finally there exists no other regulatory scheme that would significantly reduce the risk of such notes and render application of the securities laws unnecessary.  *Reves*, 494 U.S. at 66-67.  For these reasons, the Court rejects Defendants' argument that the notes purchased by Carlucci were not "securities."

  D. <u>Statutes of Limitations and Repose</u>

   Defendants argue that Carlucci's claims are untimely as they relate to certain of the pre-consolidation notes.  The

statute of limitations is an affirmative defense on which the defendant bears the burden of proof.  *See* Fed. R. Civ. P. 8(c)(1); *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007).  As such, the Court will dismiss a claim on statute of limitations grounds only "if all facts necessary to the affirmative defense 'clearly appear[] *on the face of the complaint*.'"  *Goodman*, 494 F.3d at 464 (emphasis in original) (quoting *Richmond, Fredericksburg & Potomac R.R. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993)).  With these principles in mind, the Court examines the timeliness of Carlucci's claims.

### 1.  Section 10(b) Claim

Section 10(b) claims are subject to a two-year statute of limitations and a five-year statute of repose.  28 U.S.C. § 1658(b).  A statute of limitations is "[a] law that bars claims after a specified period; specif[ically], a statute establishing a time limit for suing in a civil case, based on the date when the claim accrued."  Black's Law Dictionary 1450-51 (8th ed. 2004).  It is often subject to a "discovery rule," meaning that it does not begin to run until the plaintiff is aware (or should be aware) of his claim.  By contrast, a statute of repose is "[a] statute barring any suit that is brought after a specified time since the defendant acted."  *Id.* at 1451.  The statute of repose serves as a fixed "cutoff," and is not subject to equitable tolling.  *Lampf, Pleva, Lipkind, Prupis & Petigrow v.*

*Gilbertson*, 501 U.S. 350, 363 (1991).  The Court will consider the statute of repose and the statute of limitations separately.

a.   Statute of Repose

The statute of repose for a Section 10(b) claim "starts to run on the date the parties have committed themselves to complete the purchase or sale transaction."  *Arnold v. KPMG LLP*, 334 F. App'x 349, 351 (2d Cir. 2009); *see also Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F. Supp. 2d 1125, 1134 (C.D. Cal. 2011).  Here, Carlucci filed suit on April 24, 2012.  Defendants argue that because Carlucci purchased eight notes prior to April 24, 2007, his Section 10(b) claim -- to the extent it is based on those notes -- is barred by the statute of repose.

Carlucci responds that his Section 10(b) claim is timely as to all of the notes he purchased under the "continuing fraud exception."  (Opp'n [Dkt. 32] 12.)  Under this exception, a plaintiff may not assert a claim more than five years after a defendant's final violation of Section 10(b).  *Goldenson v. Steffens*, 802 F. Supp. 2d 240, 259 (D. Me. 2011).  But, "when a defendant has committed a violation within the repose period, it allows a plaintiff to hold the defendant accountable for previous violations that are part of the same scheme."  *Id.* District courts in the First Circuit have applied the continuing fraud exception to Section 10(b)'s statute of repose, while

district courts in the Fifth and Ninth Circuits have rejected
it.  District courts in the Second Circuit are split.[9]

The Court agrees with those courts rejecting
application of the continuing fraud exception to Section 10(b)'s
statute of repose.  Such an exception is akin to a "continuing
violation or fraudulent concealment theory premised on equitable
tolling."  *Wolfe v. Bellos*, No. 3:11-cv-2015, 2012 WL 652090, at
*6 (N.D. Tex. Feb. 28, 2012); *see also Clayton v. Landsing Pac.
Fund., Inc.*, No. 01-3110, 2002 WL 1058247, at *3 (N.D. Cal. May
9, 2002) (rejecting continuing fraud exception under the
rationale that "[plaintiffs] are trying to dress an equitable
tolling argument in new clothing to avoid the harsh result that
the *Lampf* rule requires" (quoting *Durning v. Citibank, Int'l*,
990 F.2d 1133, 1136 (9th Cir. 1993))).  The Supreme Court has

---

[9] Carlucci cites one case claiming that "the weight of authority, including in
t[he] [Second] Circuit, dictates that the five year statute of repose first
runs from the date of the last alleged misrepresentation regarding related
subject matter."  *See Plymouth Cnty. Ret. Ass'n v. Schroeder*, 576 F. Supp. 2d
360, 378 (E.D.N.Y. 2008).  This claim is dubious, given that another judge in
the Eastern District of New York has stated the opposite.  *See In re Comverse
Tech., Inc. Secs. Litig.*, 543 F. Supp. 2d 134, 155 (E.D.N.Y. 2008) ("The
weight of authority in this circuit is skeptical of the application of the
continuing violations doctrine in securities fraud cases.") (collecting
cases).  It is further belied by the number of cases in the Fifth and Ninth
Circuits rejecting the continuing fraud exception.  *See, e.g., Wolfe v.
Bellos*, No. 3:11-cv-2015, 2012 WL 652090, at *6 (N.D. Tex. Feb. 28, 2012);
*Betz v. Trainer Wortham & Co., Inc.*, 829 F. Supp. 2d 860, 864 (N.D. Cal.
2011); *In re Brocade Commc'ns Sys. Derivative Litig.*, 615 F. Supp. 2d 1018,
1035 (N.D. Cal. 2009); *Engel v. Sexton*, Nos. 06-10447, 06-10547, 07-116, 2009
WL 361108, at *15 (E.D. La. Feb. 11, 2009); *In re Maxim Integrated Prods.,
Inc. Derivative Litig.*, 574 F. Supp. 2d 1046, 1071 (N.D. Cal. 2008); *In re
Affiliated Computer Servs. Derivative Litig.*, 540 F. Supp. 2d 695, 701 (N.D.
Tex. 2007); *In re Zoran Corp. Derivative Litig.*, 511 F. Supp. 2d 986, 1014
(N.D. Cal. 2007); *Clayton v. Landsing Pac. Fund, Inc.*, No. 01-3110, 2002 WL
1058247, at *2-3 (N.D. Cal. May 9, 2002).

made clear, however, that Section 10(b)'s statute of repose is not subject to equitable tolling.[10]  *Lampf,* 501 U.S. at 363.

The "unqualified" nature of the statute of repose was recently reaffirmed in *Merck & Co., Inc. v. Reynolds*, --- U.S. ----, 130 S.Ct. 1784, 1797 (2010).  In that case, the defendant expressed concern that the Supreme Court's interpretation of the statute of limitations (discussed below) would give life to stale claims or subject defendants to liability for actions taken long ago.  *Id.*  The Supreme Court's response was that the statute of repose, which gives defendants "total" repose after five years, should assuage that fear.  *Id.*  Of course, if the continuing fraud exception were potentially applicable, the statute of repose would function much like a statute of limitations, and would not provide defendants with the sort of closure described by the Supreme Court.

In short, the Court rejects Carlucci's invitation to adopt the continuing fraud exception and, in effect, circumvent the Supreme Court's clear dictate that the statute of repose is an unqualified bar that may not be equitably tolled. Accordingly, Carlucci's Section 10(b) claim is barred by the

---

[10] The Fourth Circuit does not appear to have addressed this issue in the context of Section 10(b), but it has rejected the notion that a continuing violation theory tolls the statute of repose set forth in Section 13 of the '33 Act.  *See Caviness v. Derand Res. Corp.*, 983 F.2d 1295, 1301-02 (4th Cir. 1993).  In support of its conclusion, the court cited *Lampf's* treatment of the "similar" limitation provisions under the '34 Act.  *Id.*

statute of repose to the extent it is based on notes purchased prior to April 24, 2007.

### b.   Statute of Limitations

Defendants also argue that Carlucci's Section 10(b) claim is barred in part by the statute of limitations.  As noted above, the statute of limitations on a Section 10(b) claim is two years.  The Supreme Court recently held that the limitations period begins to run once the plaintiff discovers, or a reasonably diligent plaintiff would have discovered, the facts constituting the violation.  *Merck*, 130 S.Ct. at 1798.  Moreover, "facts showing scienter are among those that constitute the violation."  *Id.* at 1796 (internal quotation marks and alteration omitted).  In so holding, the Supreme Court expressly rejected "inquiry notice" as the relevant standard for Section 10(b) claims, stating that "the discovery of facts that put a plaintiff on inquiry notice does not automatically begin the running of the limitations period."[11]  *Id.* at 1798.  In other words, "the limitations period commences not when a reasonable investor would have begun investigating, but when such a reasonable investor conducting such a timely investigation would have uncovered the facts constituting a violation."  *City of*

---

[11] Oddly, Defendants cite *Merck* for the proposition that the limitations period does not begin to run until discovery of the facts constituting the violation (including facts showing scienter), but then immediately apply the inquiry notice standard that *Merck* expressly rejected.  (Defs.' Mem. [Dkt. 11] 8-9.)  Defendants' reliance on inquiry notice reflects a fundamental misunderstanding of *Merck*.

*Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 174
(2d Cir. 2011).

Incorrectly applying inquiry notice as the relevant
standard, Defendants reason that the limitations period
commenced on June 1, 2007 (the maturity date of the April 1,
2007 note) because on that date Carlucci did not receive his
promised payment and should have conducted a reasonable
investigation to discover the facts underlying the fraud
alleged.  (Defs.' Mem. [Dkt. 11] 8-9.)  They proceed to argue
that Carlucci's Section 10(b) claim is therefore barred by the
statute of limitations to the extent it is based on notes issued
prior to April 24, 2010 (two years before he filed suit).
(Defs.' Mem. 9.)  However, Defendants fail to demonstrate, in
accordance with *Merck*, that on June 1, 2007, Carlucci
discovered, or a reasonably diligent plaintiff would have
discovered, the facts constituting a violation of Section 10(b).
Indeed, cases applying *Merck* have rejected the notion that poor
performance of an investment is in itself sufficient to commence
the limitations period.  *See In re Bear Sterns Mortg. Pass-
Through Certificates Litig.*, --- F. Supp. 2d ----, 2012 WL
1076216, at *15 (S.D.N.Y. Mar. 30, 2012) (finding that downgrade
history of mortgage-backed securities did not convey facts
sufficient to plead '33 Act claims, and hence did not trigger
the statute of limitations).  When Carlucci's Section 10(b)

25

claim accrued is not clearly apparent on the face of the Complaint.  As such, the Court rejects Defendants' argument that the Section 10(b) claim is barred in part by the statute of limitations.

### 2.   Actual Fraud and Constructive Fraud

Virginia law sets forth a two-year statute of limitations for claims of actual fraud and constructive fraud. Va. Code § 8.01-243; *Va. Imps., Inc. v. Kirin Brewery of Am., LLC*, 296 F. Supp. 2d 691, 699 (E.D. Va. 2003).  The limitations period begins to run when the alleged fraud is discovered or should have been discovered by the exercise of reasonable diligence.  Va. Code. § 8.01-249.  Defendants again point to June 1, 2007, as the date Carlucci's actual fraud and constructive fraud claims accrued.  (Defs.' Mem. 10.)  The Court rejects Defendants' argument that on this date Carlucci knew or should have known of the fraud alleged.  *See Gilmore v. Basic Indus., Inc.*, 233 Va. 485, 489-90 (Va. 1987) (rejecting the defendants' argument that alleged fraud should have been discovered by the plaintiff as a result of the obvious defaults on promissory notes).  As with the Section 10(b) claim, when Carlucci discovered, or should have discovered, the alleged fraud is a factual question that may not be appropriately resolved at this stage of the litigation.

### 3.   Virginia Securities Act Claim

The statute of limitations for Carlucci's Virginia Securities Act claim is two years.  Va. Code § 13.1-522(D).  The statute provides that "[n]o suit shall be maintained to enforce any liability created under this section unless brought within two years after the transaction upon which it is based."  *Id.* The statute of limitations on a Virginia Securities Act claim provides an absolute cutoff and is not subject to the discovery rule.  *See Caviness v. Derand Res. Corp.*, 983 F.2d 1295, 1305-06 (4th Cir. 1993) (claim under "the Virginia Blue Sky Law is subject to an absolute cutoff two years after the transaction on which the claim is based"); *Cors v. Langham*, 683 F. Supp. 1056, 1058 (E.D. Va. 1988) ("The Virginia statute . . . has apparently taken the deliberate step of providing a hard and fast period of limitations for its Securities law.")  Accordingly, Carlucci's Virginia Securities Act claim is barred by the statute of limitations as it relates to notes issued prior to April 24, 2010.[12]

_____

[12] Carlucci urges application of a continuing fraud exception to the statute of limitations on his Virginia Securities Act claim.  (Opp'n 13.)  The Court has already determined that such an exception does not apply to Section 10(b)'s statute of repose, and finds the same with respect to the Virginia Securities Act's statute of limitations.  Notably, both limitation provisions have been described as "unqualified."  *Compare Merck*, 130 S.Ct. at 1797 (Section 10(b)'s statute of repose is an "unqualified bar on actions instituted '5 years after such violation'") *with Caviness*, 983 F.2d at 1306 ("[W]e conclude from the plain meaning of the statute that the Virginia legislature intended to provide unqualifiedly that a claim must be brought within two years 'after the transaction upon which it is based.'").  This conclusion also comports with Virginia's policy of affording the Virginia Securities Act "similar construction" as the federal securities laws.  *See Andrews v. Browne*, 276 Va. 141, 148 (Va. 2008).

E.     Whether Plaintiff's Claims are Adequately Pled

1.     Section 10(b) Claim

Section 10(b) forbids the "use or employ, in connection with the purchase or sale of any security . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78j(b).  SEC Rule 10b-5 implements Section 10(b) by making it unlawful:

(a)   To employ any device, scheme, or artifice to defraud,

(b)   To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c)   To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  Section 10(b) affords, by implication, a right of action to securities purchasers or sellers injured by its violation.  *Tellabs,* 551 U.S. at 318.

A plaintiff bringing a Section 10(b) claim "must typically prove: '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the

28

misrepresentation or omission and the purchase or sale of a
security; (4) reliance upon the misrepresentation or omission;
(5) economic loss; and (6) loss causation' (that is, the
economic loss must be proximately caused by the
misrepresentation or omission)." *Matrix Capital Mgmt. Fund, LP
v. BearingPoint, Inc.*, 576 F.3d 172, 181 (4th Cir. 2009)
(quoting *Stoneridge Inv. Partners, LLC, v. Scientific-Atlanta,
Inc.*, 552 U.S. 148, 157 (2008)).

Defendants argue that Carlucci fails to adequately
plead the following elements: a material misrepresentation,
scienter, economic loss, loss causation, and reliance.  The
Court begins by addressing whether Carlucci has sufficiently
pled a material misrepresentation.

a.   <u>Material Misrepresentation or Omission</u>

To allege a misrepresentation or omission of material
fact, a plaintiff "must point to a *factual* statement or omission
-- that is, one that is demonstrable as being true or false."
*Ottmann v. Hanger Orthopedic Grp., Inc.*, 353 F.3d 338, 342-43
(4th Cir. 2003) (emphasis in original) (quoting *Longman v. Food
Lion, Inc.*, 197 F.3d 675, 682 (4th Cir. 1999)).  Additionally,
"the plaintiff must allege that the statement is false or that
the omitted fact renders a public statement misleading." *Id.* at
343.  And, "any statement or omission must be *material*," meaning
there must be "a substantial likelihood that a reasonable

29

purchaser or seller of a security (1) would consider the fact

important in deciding whether to buy or sell the security or (2)

would have viewed the total mix of information made available to

be significantly altered by disclosure of the fact."  *Id.*

(emphasis in original) (quoting *Longman*, 197 F.3d at 682-83).

As noted earlier, the PSLRA requires a plaintiff

asserting a Section 10(b) claim to "specify each statement

alleged to have been misleading, the reason or reasons why the

statement is misleading, and, if an allegation regarding the

statement or omission is made on information and belief, . . .

state with particularity all facts on which that belief is

formed."  15 U.S.C. § 78u-4(b)(1).  In order to meet this

requirement, the plaintiff must also identify the time, place,

speaker, and contents of the alleged misrepresentations.  *Iron*

*Workers*, 432 F. Supp. 2d at 578; *see also Harrison*, 176 F.3d at

784 (Rule 9(b) requires a plaintiff to plead "the time, place

and contents of the false representations, as well as the

identity of the person making the misrepresentation and what he

obtained thereby.").

Defendants contend that Carlucci's Section 10(b) claim

should be dismissed because he fails to plead the "when" and

"where" of the alleged misrepresentations.  They also argue that

Carlucci fails to allege facts sufficient to demonstrate that

each alleged misrepresentation is false.

i.   Time and Place Requirement

With respect to time and place, the Complaint
identifies the time period over which the alleged
misrepresentations were made and various locations at which
Carlucci and Han met.  (*See* Compl. ¶¶ 14, 20, 26 (alleging that
Carlucci and Han met at the Sport and Regency Health Club,
Carlucci's residence, and Carlucci's office in Washington,
D.C.).)  The Complaint also provides the specific date each note
was issued, and identifies the false statements Han allegedly
made in soliciting Carlucci's investments.  (*See* Compl. ¶¶ 14,
16-18, 20, 22-23, 25-27.)  Contrary to Han's contention,
Carlucci need not match each alleged misrepresentation with a
specific date and place.  *See Nahigian v. Juno-Loudoun, LLC*, 684
F. Supp. 2d 731, 738-39 (E.D. Va. 2010) (refusing to dismiss
claim pursuant to Rule 9(b) where the plaintiff did not allege
the exact date and time of each of the alleged
misrepresentations and only identified a general location where
they were made); *see also Jayhawk Capital Mgmt., LLC v. LSB
Indus., Inc.*, No. 08-2561, 2009 WL 3766371, at *16 (D. Kan. Nov.
10, 2009) (finding pleading requirements of PSLRA and Rule 9(b)
satisfied where the complaint "identified the individuals, the
specific misrepresentations, the time frame (including specific
dates) and the medium in which the misrepresentations were
conveyed (letter, e-mail, telephone calls)"); *Pollack*, 1995 WL

261518, at *9 ("To require plaintiffs to provide the date and
time of every communication from [the defendant] would require
the impossible, especially where the communications occurred
over a five year period."). Simply put, the Complaint contains
sufficient detail concerning time and place such that Defendants
are aware of the particular circumstances for which they will
have to prepare a defense. *See Harrison*, 176 F.3d at 784.
Accordingly, the Court finds that Carlucci has pleaded the
"when" and "where" of the alleged misrepresentations with
requisite particularity.[13]

### ii. Falsity

Defendants also argue that Carlucci fails to plead
sufficient facts demonstrating that each alleged
misrepresentation is false. In addressing this argument, the
Court "must ascertain whether the complaint states *sufficient
facts* to permit a *reasonable* person to find that the plaintiff
satisfied this element of his claim -- that the defendant made a
false or misleading statement." *Teachers' Ret. Sys. of La. v.
Hunter*, 477 F.3d 162, 173 (4th Cir. 2007) (emphasis in
original). The Complaint sets forth various representations
Defendants allegedly made and formulaically alleges that each
one was false. (*See* Compl. ¶¶ 14-15, 17, 20-22, 26-28.)
However, Carlucci fails to plead facts that could permit a

---

[13] For the same reasons, the Court concludes that there are sufficient
allegations concerning time and place to support Carlucci's other claims.

reasonable person to find that each of these representations is false.

First, Carlucci alleges that an energy consultant who traveled with Han to Brazil informed him that there was no joint venture between Envion and Petrobas, and that there was no reasonable basis to conclude that one would materialize. (Compl. ¶ 31.)  When a plaintiff "chooses to rely on facts provided by confidential sources, it must describe the sources with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged or in the alternative provide other evidence to support their allegations."  *Teachers'*, 477 F.3d at 174 (internal quotation marks omitted).  In evaluating the sufficiency of Carlucci's allegation, the Fourth Circuit's decision in *Teachers'* is instructive.  There, shareholders filed a class-action lawsuit against the defendant and its officers, asserting, among other things, a Section 10(b) claim, in connection with alleged misrepresentations regarding its business transactions with other companies.  *Id.* at 168-69.  In support of their allegations, the plaintiffs included statements made by the defendant's employees and other confidential sources.  For example, one employee allegedly stated that "it was well-known within [the corporation] that they had overpaid for a company with dim prospects," while the assistant to the

president of a company purchased by the defendant allegedly stated that the purchased company "had no 'saleable' products" and was worth far less than the defendant paid. *Id.* at 181. The Fourth Circuit found such allegations to be "conclusory and hardly probative," noting in particular that the complaint did not state how the latter source would know such information. *Id.* The complaint also quoted the vice president of a company that entered into an R&D agreement with the defendant, allegedly as part of a sham transaction. *Id.* at 182. The Fourth Circuit discounted the source's alleged statement that the defendant never performed any real R&D work for his company, as the "complaint d[id] not allege facts to support how this source would know that [defendant] performed no 'real' R&D work . . . ."[14] *Id.*

The allegations in this case are similarly deficient. The mere fact that the source relied upon is an energy consultant who traveled with Han to Brazil (where Petrobas is located) does not sufficiently demonstrate that he would know there was no joint venture between Envion and Petrobas.[15] There

---

[14] The Fourth Circuit rejected each of the other sources cited in the complaint, and ultimately affirmed dismissal of the plaintiffs' Section 10(b) claim for, among other things, failure to plead with sufficient particularity facts demonstrating that the defendant made misleading statements. *Teachers'*, 477 F.3d at 183.

[15] Carlucci's attempt to distinguish *Teachers'* is unpersuasive. Carlucci claims that the sources in *Teachers'* were not in a position to know the facts they claimed to know. (Opp'n 18.) The Court disagrees. Contrary to Carlucci's assertion, many of the sources in *Teachers'* were employees of the defendant, or employees of companies with which the defendant transacted business. These sources were just as likely to have information relevant to

are no allegations that the energy consultant attended any
meetings, reviewed any documents, spoke with anyone at Petrobas,
or spoke with Han himself.   Nor is there a description of the
energy consultant's relationship with Han or the purpose of
their trip.   In short, Carlucci's conclusory allegations fail to
support the probability that the energy consultant possessed the
information alleged.

     As for the other alleged misrepresentations, Carlucci
simply alleges that the information he received from the energy
consultant prompted him to conduct his own "investigation,"
which allegedly revealed that each of Defendants'
representations was untrue.   (Compl. ¶ 32.)   However, Carlucci
does not describe the investigation nor does he discuss any
sources or documents supporting his allegations that each
representation was false.

     In his opposition, Carlucci contends that he has pled
other facts demonstrating the falsity of Defendants' alleged
misrepresentations.   (Opp'n 15-16.)   However, the "facts" which
he cites are for the most part the mere opposite of each of
Defendants' alleged statements.   (*See, e.g.*, Compl. ¶ 32(a)
(alleging that Defendants did not own any patent rights in the
Envion Oil Generator technology).)   Contrary to Carlucci's
assertion, these allegations do not adequately demonstrate that

---

the plaintiffs' claims, by virtue of their position, as the energy consultant
here.

Defendants' statements were false.  *See Premier Capital Mgmt.,*
*LLC v. Cohen*, No. 02-cv-5368, 2003 WL 21960357, at *3 (N.D. Ill.
Aug. 15, 2003) ("These are not adequate allegations of *why* the
subject statements were false: plaintiffs merely allege that the
statements were false because the opposite was true.  These are
conclusory allegations, not facts." (emphasis in original)).[16]

The closest Carlucci comes to pleading an additional
fact is his allegation that, rather than use his $20 million
investment for legitimate business purposes, Han used the money
to move his company to Florida and to purchase a multi-million
dollar house for himself.  (Compl. ¶ 32(b).)  There are two
problems with this allegation.  First, moving a company could
potentially constitute a "legitimate business purpose."  And
second, Carlucci fails to describe what he uncovered during his
investigation -- beyond the fact and general timing of the home
purchase -- that supports the inference that Han used Carlucci's
money to buy the house.  This allegation, as pled, does not
permit a reasonable person to conclude that Defendants
misappropriated Carlucci's $20 million investment.[17]

---

[16] It is worth noting that Carlucci makes one such allegation on information
and belief.  (*See* Compl. ¶ 32(d) ("On information and belief, Envion did not
have a backlog of 2,000 orders . . . .").)  As noted above, the PSLRA imposes
a heavy pleading burden on such an allegation, requiring the plaintiff to
"state with particularity *all* facts on which that belief is formed."  *See* 15
U.S.C. § 78u-4(b)(1) (emphasis added).

[17] Carlucci also points to his allegation that as of April 2012, Envion had
"at most a few months of financial available resources before it would be
completely insolvent and unable to pay any of its obligations," (Compl. ¶
32(g)), which, he contends, demonstrates that Defendants' representations
regarding Carlucci's potential investment return were false.  (Opp'n 16.)  As
discussed below, the Court finds these representations to be puffery, and

For these reasons, that portion of Carlucci's Section 10(b) claim that is timely is dismissed for failure to plead a material misrepresentation with requisite particularity. Because this is a pleading deficiency which can be cured, dismissal ought to be without prejudice.  However, Defendants also argue that certain of the alleged misrepresentations are non-actionable as a matter of law.  These arguments, if accepted, would dictate dismissal of the Section 10(b) claim (and other claims), to the extent based on those misrepresentations, with prejudice.  Accordingly, the Court proceeds to address those arguments.

iii.  <u>Statement-by-Statement Analysis</u>

A.  <u>Alleged Misrepresentation Regarding Envion's Patented Technology</u>

Defendants argue that the alleged misrepresentation regarding Envion's patented technology is not false because its technology is, in fact, patented.  In support of this assertion, Defendants attach to their Motion a copy of a Korean patent and a patent application filed with the World Intellectual Property Office.  (*See* Defs.' Mem. Ex. B.)

---

thus non-actionable.  But even without this finding, the allegation concerning Envion's financial state in April 2012 does not render earlier statements about Carlucci's potential investment return false at the time those statements were made.  *See Byelick v. Vivadelli*, 79 F. Supp. 2d 610, 616-17 (E.D. Va. 1999) (noting that to prevail on a Section 10(b) claim, the plaintiff must demonstrate that "the defendant made a statement of material fact that was false when made").

The parties first contest whether these documents can be considered in connection with a motion to dismiss.  Patents are generally considered matters of public record subject to judicial notice.  *See Classen Immunotherapies, Inc. v. Biogen IDEC*, No. WDQ-04-2607, 2012 WL 1963412, at *8 n.16 (D. Md. May 30, 2012).  The patent presented to the Court here, however, is of little help as it is entirely in Korean.  Defendants include a summary of the patent in English, but the translation is uncertified.  *See Thane Int'l, Inc. v. Trek Bicycle Corp.*, No. 99-cv-1470, 1999 WL 33268644, at *8 (C.D. Cal. Dec. 20, 1999) (denying request for judicial notice of Spanish court's ruling absent an authenticating declaration by a translator), *aff'd in part, rev'd in part on other grounds*, 305 F.3d 894 (9th Cir. 2002).  Without a properly certified translation, the Court will not take judicial notice of the patent.[18]

Patent applications are also public records subject to judicial notice.  *See CYBERsitter, LLC v. People's Republic of China*, 805 F. Supp. 2d 958, 963 (C.D. Cal. 2011).  The patent application submitted by Defendants is in English, and thus does not pose the same problems as the patent.  The Court will

---

[18] Even if the Court were to take judicial notice of the patent, it fails to demonstrate that Han or Envion own a patent over the Envion Oil Generator technology.  Neither Han nor Envion is identified in the patent.  Nor is it clear that the technology embodied in the patent is the same as the Envion Oil Generator technology.  All the document shows is that someone holds a patent over a device for converting plastic waste into oil in Korea.  Whether Defendants in fact own a patent over the Envion Oil Generator technology, as they allegedly represented to Carlucci, is not clearly established by the patent they have submitted.

therefore take judicial notice of the patent application filed
with the World Intellectual Property Office.  While the document
lists Envion as the applicant, it does not demonstrate that a
patent ever actually issued.  Accordingly, at this stage of the
litigation, Defendants fail to show that they in fact hold a
patent over the Envion Oil Generator technology, as allegedly
represented to Carlucci.  The falsity of Defendants'
representation as to Envion's patented technology may
potentially be demonstrated with the pleading of additional good
faith factual allegations.

> B.   Alleged Misrepresentations
>      Regarding Business Dealings

Defendants allegedly misrepresented that Envion was
"close to a deal" with Petrobas, which consisted of (1) an off-
take agreement, pursuant to which Envion would provide Petrobas
with Envion Oil Generators, and (2) a joint venture, under which
Petrobas would make a substantial investment.  (Compl. ¶ 20(b).)
Defendants argue that this alleged misrepresentation relates to
possible events contingent on the actions of a third party, and
is immaterial as a matter of law.  The Court rejects this
argument.

Representations about business dealings may be
actionable when properly supported by facts demonstrating their
falsity.  For example, in *Dunn v. Borta*, 369 F.3d 421, 431 (4th
Cir. 2004), the Fourth Circuit held that representations that

the defendant was in negotiations with certain distributors --
all major companies -- were material.  As the court explained,
representations regarding the defendant's "business dealings and
prospects are not simply sales pitches but rather can be proven
true or false -- and, if properly supported, could be found
material by a reasonable jury."  *Id.; see also Cooke v.
Manufactured Homes, Inc.*, 998 F.2d 1256, 1259 (4th Cir. 1993)
(representations about specific business projects, including
negotiation of a profitable contract with an insurer, deemed
actionable).  The same is true for Defendants' alleged
misrepresentation regarding its business dealings with Petrobas.
Accordingly, the Court finds that this representation is
potentially actionable.

C.  Alleged Misrepresentations
    Regarding Investor Interest and
    "Seasoned and Highly Regarded"
    Executives

Defendants allegedly misrepresented that certain high-
profile investors, including Warren Buffet, Bill Gates, Dow
Chemical, Morgan Stanley, and Goldman Sachs, were "interested
in" investing in Envion.  (Compl. ¶ 14(c).)  Later, Defendants
allegedly misrepresented that former President Bill Clinton had
agreed to become affiliated with Envion, possibly as a member of
its board of directors, and that former President George W. Bush
was interested in investing in Envion.  (Compl. ¶ 27.)  Carlucci
further alleges that Defendants misrepresented that Envion was

40

run by a number of "seasoned and highly regarded executives with extensive track records of success in the energy, technology, and finance industries, as well as the public sector." (Compl. ¶ 14(d).) Defendants argue that these statements are at most puffery, and consequently non-actionable. The Court agrees.

Indefinite statements of corporate optimism, also known as "puffery," are generally non-actionable as they "do not demonstrate falsity." *In re Cable & Wireless, PLC*, 321 F. Supp. 2d 749, 767 (E.D. Va. 2004) (citing *Howard v. Haddad*, 962 F.2d 328, 331 (4th Cir. 1992)). These statements have also been deemed immaterial, as a matter of law, when they are "so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available." *Id.* at 766-67.

The Court will first address the alleged misrepresentations regarding investor interest. Carlucci cites *Simmons*, 2011 WL 673759, in support of his argument that these misrepresentations are actionable. That case, however, is readily distinguishable. *Simmons* involved a bad investment in a computer software development company. *Id.* at *1. In soliciting the plaintiff's investment, two defendants allegedly represented that a group of Australian investors was close to completing a $10 million to $15 million investment in the

company and that the Australians were conducting on-site due
diligence.  *Id.*  These representations were allegedly false --
the Australians were never on-site and never anywhere near
committed to making an investment.  *Id.* at *3.  The Court found
these representations actionable, as the plaintiff alleged facts
demonstrating that they were false.  *Id.* at *5.

Here, however, Carlucci does not provide the same
level of detail as the plaintiff in *Simmons*:  there is no
discussion of the size of the investments that the investors
were interested in making, the imminence of their investments,
or whether they were in the process of conducting due
diligence.[19]  As for the allegation that Bill Clinton had agreed
to become affiliated with Envion, there is no discussion of the
former President's relevant experience in the energy and
technology sectors, if any, or how such an affiliation would
benefit Envion and increase the return on Carlucci's investment.
The Court finds Defendants' vague and general representations
about investor interest to be puffery, and hence non-actionable.
*See Kleban v. S.Y.S. Rest. Mgmt., Inc.*, 994 F. Supp. 932, 938
(N.D. Ill. 1998) (representation that specifically named "big"
investor was going to invest in restaurants was mere puffery and
not actionable).

---

[19] This lack of specificity distinguishes the alleged misrepresentations about
investor interest from those concerning the joint venture with Petrobas as
well.

Defendants' touting of Envion's management team's experience suffers from the same fatal flaw.  No reasonable investor would rely on such a representation, rendering it immaterial as a matter of law.  *See In re Advanta Corp. Secs. Litig.*, 180 F.3d 525, 537-39 (3d Cir. 1999) (letter touting "an experienced management team" held to be non-actionable); *Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1245-46 (N.D. Cal. 1998) (representation that "[w]e have good people, a good management team" deemed non-actionable) (citing *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 290 (4th Cir. 1993))); *In re Gupta Secs. Litig.*, 900 F. Supp. 1217, 1236 (N.D. Cal. 1994) (representation that "[we have] a very senior and seasoned management team" deemed non-actionable).  Consequently, Carlucci's claims are dismissed with prejudice insofar as they are premised on these alleged misrepresentations.

D. Alleged Misrepresentations Regarding Potential Investment Return

Finally, Defendants allegedly misrepresented the return Carlucci would potentially receive on his investment in Envion.  Specifically, Defendants allegedly represented to Carlucci that Envion would be the "best" return he had received on any investment, that he would receive his investment back in three weeks, and that he would receive "possibly up to 50 times" the amount he invested.  (Compl. ¶¶ 14(h), 20(c), 22, 26(a).)

43

The Court agrees with Defendants that these representations are non-actionable opinion or puffery.

The Fourth Circuit's decision in *Raab v. General Physics Corp.*, 4 F.3d 286 (4th Cir. 1993), is instructive here. There, the court addressed statements in an annual report that "[r]egulatory changes . . . combined with the rising importance of environmental restoration and waste management, have created a marketplace for [one of the company's divisions] with an expected annual growth rate of 10% to 30% over the next several years" and "[that division] is poised to carry the growth and success of 1991 well into the future." *Id.* at 288.  The court found these statements "hardly material," noting that the discussion of growth was "plainly by way of loose prediction, and both the range of rates cited, as well as the time for their achievement, are anything but definite." *Id.; see also Longman*, 197 F.3d at 684 & n.2 (statements that "Food Lion is one of the best-managed high growth operators in the food retailing industry" and that the company provided its employees with "some of the best benefits in the supermarket industry" were "immaterial puffery").

Here, Defendants' alleged misrepresentations regarding Carlucci's potential investment return are the quintessential examples of non-actionable puffery.  The alleged misrepresentations -- that Envion would provide Carlucci with

44

the best return he had ever received, possibly up to 50 times his investment -- are far looser and less definite than those in *Raab*. As in *Raab*, there is no way a reasonable investor would rely on such statements in deciding to make an investment.[20]  *Id.* at 290.

Carlucci argues that the alleged misrepresentations are actionable because Defendants knew or should have known the representations were false at the time they were made.  (Opp'n 17.)  In support of this argument, Carlucci cites *Dunn*.  There, the Fourth Circuit stated that "[a]lthough financial projections are often held not to constitute material misrepresentations, 'projections and statements of optimism are false and misleading for the purposes of the securities laws if they were issued without good faith or lacked a reasonable basis when made.'" *Dunn*, 369 F.3d at 431 n.20 (quoting *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1277 (D.C. Cir. 1994)).  However, the court provided little detail as to what these financial projections were.  And, of import here, it noted that the plaintiff "d[id] not allege mere exaggeration and opinion, nor d[id] he assert that the Defendants promised him a great investment or an amazing return on his money."  *Id.* at 431.  Yet, this is precisely the type of representation Defendants allegedly made concerning Carlucci's potential investment return.  As set forth

---

[20] Indeed, it is worth noting that the alleged promise of a return up to 50 times Carlucci's investment would translate, in dollar figures, to a return in excess of $1.6 billion on a $32,393,000 investment.

above, these alleged misrepresentations fall directly into the
category of puffery declared non-actionable in *Raab*.  In short,
the alleged misrepresentations at issue are the sort of opinion
and exaggeration that is immaterial as a matter of law.[21]  Thus,
Carlucci's claims are dismissed with prejudice to the extent
based on these alleged misrepresentations.

> b.  Scienter

     In a securities fraud action, "the term 'scienter'
refers to a mental state embracing intent to deceive,
manipulate, or defraud." *Ottmann*, 353 F.3d at 343 (quoting
*Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n.12 (1976)).
For this element of a Section 10(b) claim, "a plaintiff must
allege that the defendant made the misleading statement or
omission intentionally or with 'severe recklessness' regarding
the danger of deceiving the plaintiff." *Teachers'*, 477 F.3d at
184 (citation omitted).  For purposes of Section 10(b), a
reckless act is one "so highly unreasonable and such an extreme
departure from the standard of ordinary care as to present a
danger of misleading the plaintiff to the extent that the danger

---

[21] Citing the PSLRA safe harbor for forward-looking statements, 15 U.S.C. §
78u-5(c), Carlucci also argues that such statements are only protected if
accompanied by cautionary language.  (Opp'n 17.)  This argument misses the
mark.  Contrary to Carlucci's suggestion, the cautionary-language
requirement, 15 U.S.C. § 78u-5(c)(1)(A)(i), and the puffery rule operate
independently of one another.  *Cf. Southland Secs., Corp. v. INSpire Ins.
Solutions, Inc.*, 365 F.3d 353, 372 (5th Cir. 2004) (finding that five
forward-looking statements failed to satisfy Section 78u-5(c)(1)(A)(i), but
that two were nonetheless non-actionable puffery).  Given the Court's
conclusion that the alleged misrepresentations are non-actionable puffery,
whether or not the statements were accompanied by cautionary language is
irrelevant.

was either known to the defendant or so obvious that the
defendant must have been aware of it." *Matrix Capital*, 576 F.3d
at 181 (quoting *Pub. Emps.' Ret. Ass'n of Colo. V. Deloitte &
Touche LLP*, 551 F.3d 305, 313 (4th Cir. 2009)).

With respect to forward-looking statements and
opinions, however, the standard is higher.  In those cases, the
plaintiff must allege facts demonstrating that the statement was
made with actual knowledge of its falsity.  *See* 15 U.S.C. § 78u-
5(c)(1)(B)(i) (for forward-looking statements, a plaintiff must
prove that the statement "was made with actual knowledge by that
person that the statement was false or misleading"); *Nolte v.
Capital One Fin. Corp.*, 390 F.3d 311, 315 (4th Cir. 2004) (in
order to plead that an opinion is a false statement in a
securities fraud case, "the complaint must allege that the
opinion expressed was different from the opinion actually held
by the speaker" (citing *Va. Bankshares, Inc. v. Sandberg*, 501
U.S. 1083, 1093 (1991))).

The PSLRA significantly strengthened the requirement
for pleading scienter.  *Teachers'*, 477 F.3d at 184.  While under
Rule 9(b) a person's state of mind "may be alleged generally,"
Fed. R. Civ. P. 9(b), the PSLRA requires a plaintiff to "state
with particularity facts giving rise to a strong inference that
the defendant acted with the required state of mind," 15 U.S.C.
§ 78u-4(b)(2).  In other words, a plaintiff cannot merely plead

facts from which a reasonable person could infer that the defendant acted with scienter; rather, the plaintiff must "plead with particularity facts that give rise to a 'strong' -- *i.e.*, a powerful or cogent -- inference." *Tellabs*, 551 U.S. at 323. In determining whether the alleged facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences. *Id.* at 323-24. "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

The Complaint in this case fails to raise a strong inference of scienter. Carlucci raises two arguments in support of his argument to the contrary. First, he contends that the Complaint adequately demonstrates that Han possessed facts that suggested his representations were false when made. (Opp'n 22.) This argument fails for the obvious reason that the Complaint does not adequately plead that the alleged misrepresentations were false. *See Teachers'*, 477 F.3d at 184 (agreeing with the district court's conclusion that "[b]ecause no misleading statement or omission was sufficiently alleged, the defendants could not have made misrepresentations or omissions intentionally or with sufficient recklessness"). It is also worth noting that the allegations which Carlucci cites in

48

support of assertion are formulaic allegations that Han "knew or should have known, [the alleged misrepresentations] were false at the time they were made" (Compl. ¶¶ 15, 21, 28) along with a list of Defendant's alleged misrepresentations, the opposite of which Carlucci discovered "[a]s a result of [his] investigation," (Compl. ¶ 32).  Clearly, the PSLRA requires a plaintiff to allege more in raising a strong -- *i.e.*, powerful and cogent -- inference that the defendant acted with the requisite mental state.  *See In re PEC Solutions Secs. Litig.*, No. 03-cv-331, 2004 WL 1854202, at *14 (E.D. Va. May 25, 2004) ("Plaintiffs' allegations of scienter fail because the Court cannot simply infer or imply knowledge of material facts based upon conclusory allegations."), *aff'd* 418 F.3d 379 (4th Cir. 2005).

Carlucci's second argument is that he has supported his allegations of scienter by showing Han's "motivation and personal gain" from the fraud.  (Opp'n 22.)  While facts demonstrating motive and opportunity to commit fraud "may be relevant to the scienter inquiry, the weight accorded to those facts should depend on the circumstances of each case." *Ottmann*, 353 F.3d at 345-46; *see also In re PEC Solutions*, 2004 WL 1854202, at *14 (noting that "the presence of facts demonstrating motive and opportunity alone may not be sufficient to give rise to a strong inference of scienter," but that "such

49

facts are nonetheless relevant to the question of whether the required state of mind exists"). In support of this argument, Carlucci cites the allegation that Han used his $20 million investment not for legitimate business purposes, as represented, but instead for his own personal use. (*See* Compl. ¶ 24.) Specifically, it is alleged in the Complaint that around the same time Carlucci made the $20 million investment, Han bought a house in Florida valued at $3.5 million. (*Id.*) However, as discussed above, it does not necessarily follow that the money Han spent on a home around the same time as the $20 million investment was money that Han received from Carlucci. Indeed, there is no allegation in the Complaint that Han had no other means to make this purchase. As such, the fact and general timing of the home purchase fall short of raising the strong inference of scienter required by the PSLRA. *See Tellabs*, 551 U.S. at 24 (holding that inference of scienter must be "at least as compelling as any opposing inference one could draw from the facts alleged"). For these reasons, Carlucci fails to establish a strong inference of scienter.

        c.   <u>Economic Loss and Loss Causation</u>

A securities fraud plaintiff must adequately allege that the "defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss." *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 346 (2005). "The

facts alleged in the complaint . . . need not conclusively show that the securities' decline in value is attributable solely to the alleged fraud rather than to other intervening factors." *In re Mut. Funds Inv. Litig.*, 566 F.3d at 128.  However, the plaintiff must demonstrate that the "defendant's conduct was a *substantial* cause of its injury." *Id.* (emphasis in original) (quoting *Miller v. Asensio & Co., Inc.*, 364 F.3d 223, 229 (4th Cir. 2004).  Loss causation must be pled with "'sufficient specificity,' a standard largely consonant with [Rule] 9(b)'s requirement that averments of fraud be pled with particularity." *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 471 (4th Cir. 2011).  The degree of specificity required is that which will "enable the court to evaluate whether the necessary causal link exists." *Id.* (quoting *Teachers'*, 477 F.3d at 186).

Here, Carlucci fails to allege with sufficient specificity that Defendants' alleged misrepresentations caused him to suffer an economic loss.  Indeed, Defendant does not specify what his economic loss is.  As noted above, the notes need not mature, and Defendants need not miss a payment, for Defendant to have incurred damages; if the notes were worth less than the consideration Carlucci paid, then he suffered a cognizable injury.  The problem is that nowhere in the Complaint does Carlucci allege this.  In his opposition, Carlucci argues that he invested $32,393,000 in Envion and "received nothing for

his investment" and that his securities are "worthless." (Opp'n 25.) However, there are no such allegations in the Complaint. *See Casella v. Borders*, 404 F. App'x 800, 804 n.2 (4th Cir. 2010) (unpublished) ("The Court will not consider facts not pled, nor will it entertain facts that cannot be inferred from the bare allegations of the [] Complaint."). Instead, Carlucci baldly alleges that he has been damaged in an amount "no less than $32,393,000" and that his damages are the "direct and proximate result of [Defendants'] fraudulent conduct."[22] (*See* Compl. ¶¶ 34, 42.) From these allegations, there is no way of knowing whether Carlucci's economic loss is based on value differential, missed payments, or both. To be sure, Carlucci need not allege the precise amount of his economic loss. *See Katyle*, 637 F.3d at 472 ("We do not suggest that plaintiffs were required to allege the precise loss attributable to [the defendant's] fraud . . . ." (quoting *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 177 (2d Cir. 2005))). But, he must at least plead a theory of economic loss, supported by allegations showing that Defendants' conduct is a substantial cause of that

---

[22] Carlucci's only allegation relevant to the value of Envion is that he learned in April 2012 that "Envion had at most a few months of available financial resources before it would be completely insolvent and unable to pay any of its obligations." (Compl. ¶ 32(g).) However, this allegation does not establish that Carlucci's investments were worthless at the time Carlucci made them, as argued in his opposition.

loss.  Carlucci neglects to do either, and thus fails to plead

economic loss and loss causation with sufficient specificity.[23]

## 2.   Other Claims

The Court will also dismiss Carlucci's actual and

constructive fraud claims, as well as the Virginia Securities

Act claim to the extent it is not time-barred.  While the PSLRA

does not apply to these claims, all three claims must be pled

with particularity under Rule 9(b).

In Virginia, a plaintiff asserting a claim of actual

fraud must demonstrate (1) a false representation by the

defendant, (2) of a material fact, (3) made intentionally and

knowingly, (4) with intent to mislead, (5) reliance by the

misled party, and (6) resulting injury to the party misled.

*Diaz Vicente*, 736 F. Supp. at 690.  The elements of a state law

fraud claim are essentially the same as those necessary to

establish a Section 10(b) claim, except that fraud must be

proved by clear and convincing evidence.  *Arabian v. Bowen*, 966

F.2d 1441, 1992 WL 154026, at *5 (4th Cir. July 7, 1992)

(unpublished table decision).  For reasons discussed in

connection with the Section 10(b) claim, Carlucci fails to plead

with requisite particularity a material misrepresentation,

---

[23] The Court has found Carlucci's Section 10(b) claim deficient on several
independent grounds, which, as discussed below, also results in dismissal of
his other claims.  As such, the Court need not address Defendants' argument
that Carlucci fails to plead justifiable reliance, which, in any event, is a
fact-intensive question and generally inappropriate for determination on a
motion to dismiss.  *Sawabeh Info. Servs. Co. v. Brody*, 832 F. Supp. 2d 280,
304-05 (S.D.N.Y. 2011) (citing *Schlaifer Nance & Co. v. Estate of Warhol*, 119
F.3d 91, 98 (2d Cir. 1997)).

scienter, and resulting injury.  The failure to do so dictates
dismissal of his actual fraud claim.

In Virginia, the elements of a claim for constructive
fraud are identical to those for actual fraud, except for the
intent element.  *Design & Prod., Inc. v. Am. Exhibitions, Inc.*,
820 F. Supp. 2d 727, 742 (E.D. Va. 2011).  To plead a claim for
constructive fraud, a plaintiff must show "that a false
representation of a material fact was made innocently or
negligently, and the injured party was damaged as a result of
his reliance upon the misrepresentation."  *Schmidt v. Wells
Fargo Home Mortg.*, No. 3:11-cv-059, 2011 WL 1597658, at *5 (E.D.
Va. Apr. 26, 2011) (quoting *Mortarino v. Consultant Eng'g
Servs., Inc.*, 251 Va. 289, 295 (Va. 1996)).  Because Carlucci
fails to plead a material misrepresentation and resulting injury
with requisite particularity, the Court dismisses his
constructive fraud claim.[24]

And finally, to state a claim under the Virginia
Securities Act, a plaintiff must plead a material
misrepresentation.[25]  *See Dunn*, 369 F.3d at 426.  Carlucci's
failure to particularly plead a material misrepresentation

---

[24] Count IV of the Complaint is actually titled, "Constructive Fraud/Negligent
Misrepresentation."  Defendants are correct that Virginia does not recognize
a claim for negligent misrepresentation.  *See Design & Prod., Inc.*, 820 F.
Supp. 2d at 742.  Thus, to the extent Carlucci seeks to state a claim for
negligent misrepresentation under Count IV, the claim is dismissed with
prejudice.
[25] Scienter, reliance, and causation are not required elements of a Virginia
Securities Act claim.  *See Dunn*, 369 F.3d at 432; *Diaz Vicente*, 736 F. Supp.
at 694; *Tanner v. State Corp. Comm'n*, 265 Va. 148, 158 (Va. 2003)

therefore dictates dismissal of his Virginia Securities Act
claim.

## IV.  Conclusion

For these reasons, the Court will grant Defendants'
Motion.

An appropriate Order will issue.


_____
                                    /s/
August 7, 2012                James C. Cacheris
Alexandria, Virginia      UNITED STATES DISTRICT COURT JUDGE