IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

FRANK C. CARLUCCI III,        )
                              )
      Plaintiff,              )
                              )
         v.                   )   1:12cv451 (JCC/TCB)
                              )
MICHAEL S. HAN, *et al.*,     )
                              )
      Defendants.             )

## A M E N D E D   M E M O R A N D U M   O P I N I O N

      This matter is before the Court on Defendants Michael
Han ("Mr. Han") and Envion, Inc.'s ("Envion") (collectively,
"Defendants") Motion to Strike [Dkt. 41] (the "Motion to
Strike") and Partial Motion to Dismiss [Dkt. 45] (the "Motion to
Dismiss").  For the following reasons, the Court will grant
Defendants' Motion to Strike and deny Defendants' Motion to
Dismiss.

### I. Background

      This case arises out of allegations that Defendants
engaged in securities fraud, in violation of federal and state
law, as well as actual and constructive fraud.  Federal
jurisdiction in this case is based on federal question
jurisdiction pursuant to 28 U.S.C. § 1331, diversity

jurisdiction pursuant to 28 U.S.C. § 1332, and supplemental

jurisdiction pursuant to 28 U.S.C. § 1367.

Defendant Envion, Inc. is a privately-held company.

According to Plaintiff's Amended Complaint, Envion represents

itself to the public as a technology company that holds the

patent rights to a proprietary system utilizing a purportedly

efficient, cost effective, and environmentally sensitive

technology capable of recapturing energy by converting plastic

waste into usable oil.[1]  (AC ¶ 9.)  Defendant Michael S. Han is

the founder, Chairman, and Chief Executive Officer ("CEO") of

Envion.  Mr. Han allegedly "controls all aspects of Envion's

business endeavors, including but not limited to, all dealings

with potential investors and potential business partners,

financial records, and matters relating to the intellectual

property..."  (AC ¶ 3.)  Plaintiff Frank Carlucci III ("Mr.

Carlucci" or "Plaintiff") is an investor in Envion.

A. Factual Background

In approximately 2003, Plaintiff Frank Carlucci III

met Defendant Michael Han at the Regency Sport and Health Club,

---

[1] Regarding Envion's business, Plaintiff's Amended Complaint alleges that
Envion publicly represents on its website that the "centerpiece of its
technology, and the foundation for the entire company, is a 'proprietary
system, the Envion Oil Generator™, which transforms plastic waste back to its
original form – crude oil.'" (AC ¶ 10.)  The Envion website allegedly
expounds upon this description of Envion Oil Generator in calling it "a
proprietary breakthrough technology developed and perfected over the past 15
years" and the "first plastic waste to oil conversion platform of its kind."
(AC ¶ 11.)  Plaintiff alleges that Envion "has had no more than a handful of
employees at any one time."  (AC ¶ 4.)

where they both regularly played tennis. (AC ¶ 12.)

Thereafter, in early 2004, Mr. Han solicited an investment from

Carlucci in his company, Envion, Inc. (AC ¶ 13.) Mr. Han

described Envion as a "technology company" that would "bring

technology [he] owned to the United States that his uncle had

developed in Korea." (*Id.*) Mr. Han described that technology

as "a patented process involving the conversion of plastic waste

into oil." (*Id.*)

Through a series of telephone calls and face-to-face

meetings at Mr. Carlucci's residence and the Regency Sport and

Health Club in early 2004, Mr. Han allegedly made various

misrepresentations and omissions of material fact relating to

Envion and its business in order to induce Mr. Carlucci to

invest in the company. (AC ¶ 14.) These alleged

misrepresentations included the following: (1) that Mr. Han and

Envion owned the exclusive patent rights in their Envion Oil

Generator technology, which formed the foundation for Envion's

business and success; (2) that Mr. Han had lined up the

investment banking house, Allen & Company, to raise funds for

Envion and that Allen & Company would be an equity investor in

the company; (3) that Mr. Han had communicated with numerous

other investors who were interested in investing in Envion,

including Warren Buffet, Bill Gates, Dow Chemical, Morgan

Stanley, and Goldman Sachs; (4) that, along with Mr. Han, Envion

was run by a number of "seasoned and highly regarded executives with extensive track records of success in the energy, technology, and finance industries, as well as the public sector"; (5) that Mr. Han was negotiating a lucrative arrangement with Waste Management Company pursuant to which Waste Management would purchase rights to use Envion's technology; (6) that Mr. Han was negotiating a lucrative arrangement with Allied Republic, another waste management company and a competitor of Waste Management; (7) that Envion had a backlog of orders for its Oil Generator product; and (8) that for each of these reasons, Envion would provide the best return Mr. Carlucci had received on any investment. (AC ¶¶ 14(a)-(h).) Plaintiff's Amended Complaint alleges that Mr. Carlucci would only later learn that Mr. Han's representations were false at the time they were made. (AC ¶ 15.)

Unaware of the falsity of Mr. Han's statements, Mr. Carlucci thereafter "reasonably and justifiably" relied on Mr. Han's alleged misrepresentations and omissions of material fact in deciding to invest in Envion. (AC ¶ 16.) On March 4, 2004, in "direct and reasonable" reliance on the alleged misrepresentations, Mr. Carlucci made an investment in Envion in the amount of $500,000. (*Id.*) The investment was in the form of a convertible promissory note, which Mr. Carlucci could convert at any time into Envion common stock. (*Id.*)

Over the next several years, Mr. Han approached Mr. Carlucci for additional investments in Envion. (AC ¶ 17.) On each occasion, Mr. Han allegedly misrepresented the state of Envion's business, its specific business arrangements, its financial prospects, and the extent of its intellectual property ownership, portraying each in an exceedingly positive and favorable manner that Plaintiff alleges did not comport with the reality of Envion's situation at the time. (*Id.*) For example, Mr. Han represented that Envion had exclusive patent rights in its critical technology and that Envion had many favorable business arrangements with foreign corporations that would generate substantial return on any investment that Mr. Carlucci made. (*Id.*) From November 2004 through April 2010, in reliance on these alleged these alleged misrepresentations, Mr. Carlucci invested an additional $11,593,000 in Envion. (AC ¶¶ 17-18.) Each investment was evidenced by a convertible promissory note that accrued interest in the range of 8% to 10% annually and could be converted at any time into Envion common stock, *i.e.*, equity in the company. (AC ¶ 19.)

In or around September and October 2010, Mr. Han approached Mr. Carlucci for an additional $20 million investment. (AC ¶ 20.) Through a series of face-to-face meetings at Mr. Carlucci's residence, Mr. Han allegedly made additional misrepresentations in order to induce Mr. Carlucci's

investment, which included the following: (1) that Envion had a "done deal with Gazprom," one of the world's largest gas companies, pursuant to which Gazprom would invest millions in Envion in exchange for a 49% ownership interest and Mr. Han would become the CEO of Gazprom's wholly-owned waste disposal subsidiary (which would fully utilize Envion's technology); (2) that Envion was close to a "deal" with Petrobas, a Brazilian energy company, which consisted of two parts: (i) an off-take agreement, under which Envion would provide Envion Oil Generators to Petrobas; and (ii) a joint venture, under which Petrobas would invest "substantial sums of money" in Envion; (3) that, because a sizeable investment from Gazprom was a "done deal," Mr. Carlucci would get his investment back "in three weeks"; (4) that Envion had a "backlog of 2,000 orders" for its Envion Oil Generators; (5) that Mr. Carlucci's $20 million investment would be used exclusively for two purposes: (i) for Envion to buy out Han's uncle, who was becoming anxious to realize an immediate return on his investment in Envion, and (ii) as investment capital in and exclusively for Envion's legitimate business purposes; and (6) that Envion owned the exclusive patent rights in its Envion Oil Generator technology. (AC ¶ 20(a)-(f).) It is alleged in the Amended Complaint that Mr. Carlucci would only later learn that each of these

representations was false at the time they were made. (AC ¶ 21.)

At the same time that Mr. Han solicited Mr. Carlucci's investment, Mr. Han also assured Mr. Carlucci that "Envion would be the best return [he] would receive on any investment," possibly up to "50 times" the amount he had invested. (AC ¶ 22.) To support this representation, Mr. Han had previously presented Mr. Carlucci with a projection of the return he would receive. (*Id.*) In connection with Mr. Han's solicitation of the $20 million investment, Mr. Carlucci asked if the projection was still valid. In response, Mr. Han allegedly stated "Yes, it is." (*Id.*) According to Mr. Carlucci, no cautionary language, qualifications, or conditions accompanied the projection. (*Id.*) Mr. Carlucci alleges that he invested $20 million in Envion in direct and reasonable reliance on these alleged misrepresentations, as evidenced by a convertible promissory note dated October 10, 2010 (the "October 2010 Note"). (AC ¶ 23.) The note accrued interest at an annual rate of 8% and could be converted at any time into Envion common stock, *i.e.*, equity in the company. (*Id.*)

Around the same time Mr. Carlucci made the $20 million investment, Mr. Han allegedly moved Envion from Washington, D.C. to Florida and purchased a home in Florida valued at $3.5

million.[2]  (AC ¶ 24(a)-(c).)  Mr. Han also allegedly provided himself with "very substantial" annual salary for his employment as Envion.  This salary was not disclosed to Mr. Carlucci. Plaintiff states that, on information and belief, from information gained from the former Chief Financial Officer of Envion, who allegedly "worked closely with Mr. Han and was aware of the status of Envion's business dealings from 2009 through early 2011," the amount of that annual salary is $5 million and that it was unilaterally awarded by Mr. Han to himself at a time when Envion was either insolvent or on the verge of insolvency. (AC ¶ 24(c).)

In August of 2011, Mr. Carlucci's prior investments were "rolled into" one convertible promissory note in the amount of $32,393,000 (hereinafter, the "August 2011 Note").[3]  (AC ¶ 25.)  Dated August 4, 2011, this convertible note accrues interest at 5% annually and could be converted at any time into common stock of Envion, *i.e.*, equity in the company.  (*Id.*)

Immediately prior to and in connection with the purchase and issuance of the August 2011 Note, Mr. Han and Mr. Carlucci had several face-to-face meetings at Mr. Carlucci's residence, the Regency Sport and Health Club, and at Mr.

---

[2] Mr. Carlucci alleges on information and belief that Mr. Han has claimed a Florida Homestead Exemption over this residence. A Homestead Exemption may be used upon the satisfaction of certain requirements to shield assets from claims of certain creditors.  *See* Fla. Const. art. X, § 4.

[3] The sixteen notes which were rolled into the August 2011 Note are collectively referred to herein as "the pre-consolidation notes."

Carlucci's office in Washington, D.C. (AC ¶ 26.) It is asserted Mr. Han reasserted his prior false representations during these meetings, allegedly motivated by his desire to induce Mr. Carlucci to consummate his purchase of the August 2011 Note. (*Id*.) Specifically, Mr. Han repeated that (1) Envion owned the exclusive patent rights in its Envion Oil Generator technology; (2) all of the funds invested by Mr. Carlucci had been used exclusively for the benefit of Envion and its direct business, including the "buy out" of Mr. Han's uncle; (3) that Mr. Carlucci would receive a return on his investment of "possibly 50 times the amount invested," due to the "done deal" with Gazprom, and other specific projects and commitment Mr. Han had obtained or was in the process of closing for the benefit of Envion, including a deal with Petrobas. (AC ¶ 26 (a)-(c).) Mr. Han also allegedly represented that former President Bill Clinton had agreed to affiliate himself with Envion, possibly as a member of its board of directors, and that former President George W. Bush was interested in investing in Envion. (AC. ¶ 27.)

Mr. Carlucci alleges that he only later came to find out that each of the representations Mr. Han made was false, and that Mr. Han had actual knowledge of their falsity or should have known that they were false at the time he made them. (AC ¶¶ 15, 17, 21, 28.) Plaintiff alleges that Mr. Han, "as the

founder, Chairman, and CEO of Envion, and person who controlled the use of the sum Mr. Carlucci invested, handled all discussions with Gazprom and Petrobas (if any), and knew the true facts about Envion's alleged intellectual property rights", "... unquestionably knew these representations to be false when made." (AC ¶ 28.) Plaintiff further alleges that he reasonably and justifiably relied on each of Han's misrepresentations and omissions of material fact in deciding to invest in purchasing the August 2011 Note. (AC ¶ 29.)

Plaintiff alleges that, around this time period, Mr. Han began leading an "increasingly lavish lifestyle." (AC ¶ 30.) According to the former Chief Financial Officer of Envion, who allegedly "observed Mr. Han's spending on a first-hand basis," Mr. Han regularly traveled abroad, allegedly claiming to be meeting with potential investors or pursuing new deals. Plaintiff also alleges that Mr. Han "took luxury vacations, including personal trips to St. Bart's" and that "[w]hen he took these trips, Mr. Han traveled first-class or on private jets," an instance of which includes Mr. Han's charter of a plane in the summer of 2010 for the purpose of flying guests to the Turks and Caicos Islands for his wedding. (*Id.*) Plaintiff also alleges that Mr. Han drove "top of the line luxury cars" during this time period, which he sold or exchanged "several times a

year" for newer models.[4]  (*Id*.)  Plaintiff states that "Mr. Han's purchase of a $3.5 million house in Palm Beach was part and parcel of [this] grand lifestyle."  (*Id*.)

Plaintiff alleges that "Mr. Han had (and has) no profitable or financially successful employment, no known source of funds, other than the investment funds provided by Mr. Carlucci, and no profitable or financially successful deals or joint ventures with companies other than Envion."  (AC ¶ 30.) Plaintiff further alleges that the "only source of funds from which Mr. Han was able to afford this lavish lifestyle was the unauthorized use of the millions of dollars invested by Mr. Carlucci in Envion (and exclusively for Envion's legitimate business purposes."  (*Id*.)

In March of 2012, Mr. Carlucci began to suspect that Mr. Han's representations were materially false and/or that he had omitted material facts in his representations to Mr. Carlucci that allegedly induced his investment.  (AC ¶ 31.) Specifically, in or around March and early April of 2012, Mr. Carlucci met with Laurent Lavigne du Cadet, a third-party energy consultant directly involved in assisting Envion in its business, who allegedly learned first-hand the true status of Envion's business.  (AC ¶ 32.)

---

[4] The Amended Complaint cites "Porsche" and "Audi," specifically the "Audi A8," as constituting the sorts of "luxury cars" driven by Mr. Han during this time period.

In March of 2012, Mr. Lavigne du Cadet allegedly met with Mr. Han on several occasions and, without limiting the breadth of their discussions, discussed the status of Envion's business and respective operations in detail, including the status of Envion's joint venture with Petrobas, which Mr. Han allegedly stated was "imminent." (AC ¶ 33.) The Amended Complaint alleges that regarding the "critical aspects of Envion's alleged business, ..., Mr. Han specifically affirmed and represented to Mr. Lavigne du Cadet the same representations Mr. Han made to Mr. Carlucci about Petrobas..." (*Id.*)

Thereafter, Mr. Lavigne du Cadet traveled with Mr. Han to Brazil in late March of 2012 and participated in meeting with Mr. Han and representatives of Petrobas. (AC ¶ 35.) During these meetings and through subsequent conversations, "Mr. Lavigne du Cadet learned that Envion had no joint venture with Petrobas or any reasonable basis for concluding that a joint venture would materialize." (AC ¶ 35.) Allegedly, the only possibility of an agreement between Envion and Petrobas was an off-take agreement under which Petrobas would eventually buy synthetic crude oil from Envion, contingent upon that crude oil meeting certain specifications. (*Id.*) However, this off-take agreement itself has not yet materialized. (AC ¶ 36.) Furthermore, Plaintiff notes that this off-take agreement is not a joint venture, and states that this agreement does not add any

material value to Envion, as the agreement does not entail any investment or cost-bearing whatsoever on the part of Petrobas, and all of the cost and risk is squarely placed upon Envion. (*Id.*) Mr. Lavigne du Cadet also allegedly learned that Envion did not have any joint ventures with any other companies, contradicting Mr. Han's assertion that a joint venture with Gazprom was a "done deal." (AC ¶ 37.) Mr. Lavigne du Cadet is also alleged to have been specifically informed by Mr. Han that Envion only had enough funding to keep the company going for three more months. (AC ¶ 38.)

This foregoing information was subsequently reported to Mr. Carlucci, causing him to engage in further investigation of Mr. Han and Envion. (AC ¶ 39.) This investigation "involved discussions by Mr. Carlucci with Mr. Lavigne du Cadet; discussions with Envion's former Chief Financial Officer, who was employed by the company from 2009 through early 2011; and the work product investigations engaged in by Mr. Carlucci's counsel." (*Id.*) As a result of that investigation, Mr. Carlucci came to understand, allegedly for the first time in late-March to mid-April of 2012, that several of the representations that Mr. Han had previously made were either misleading or outright false. (*Id.*)

Specifically, Mr. Carlucci found that Defendants did not own the exclusive patent rights in the Envion Oil Generator

technology, either as inventor or owner via assignee, at the time Mr. Han represented Envion's affirmative ownership to Mr. Carlucci.[5] (AC ¶ 39(a).) It is also alleged that Mr. Han later corroborated this fact via internal Envion documentation that was disclosed to Mr. Carlucci in response to the possibility of litigation.[6][7] (AC ¶ 39(b).) Mr. Carlucci also learned that Defendants' right to use the technology, as based on Defendants' alleged Korean patent rights to the subject technology, are subject to dispute.[8] (AC ¶ 39(d).) It is further alleged that

---

[5] Plaintiff states that a patent search of the United States Patent and Trademark database revealed that neither Mr. Han nor Envion is the named inventor or owner via assignment (or otherwise) of any such technology patents. Plaintiff further states that an application was not so much as even submitted until March 2012, well-after the representations that Mr. Han made to Mr. Carlucci. Prior to that March 2012 application, "Envion had only filed ... a "provisional" patent application, which merely served as a placeholder, ... and from which no patent did or could issue." (AC ¶ 39(a).)

[6] "The fact that neither Mr. Han nor Envion owned any patents for the Envion Oil Generator technology was corroborated shortly thereafter by Mr. Han. Under the threat of litigation, on April 5, 2012, in response to a letter from Mr. Carlucci's attorney, Mr. Han sent Mr. Carlucci a document titled, 'Envion Projects October 2011-March 2012.' This document made clear for the first time that as of 'October 2011-March 2012,' Envion was only preparing to file patent applications in the United States, Brazil, and 35 European countries." (AC ¶ 39(b).)

[7] The Amended Complaint also alleges that the fact that neither Mr. Han nor Envion owned a patent to the technology was further corroborated through Defendants' Motion to Dismiss Mr. Carlucci's original Complaint, in which Defendants identified a Korean patent and international patent application that they claimed to demonstrate Envion's positive ownership of a patent to the Envion Oil Generator technology. Plaintiff alleges that this Korean patent identifies neither Mr. Han nor Envion as inventors or owners, but instead identifies "Myung Duck Ma" as its inventor. This individual is the "Uncle Ma" referenced by the parties. Plaintiff alleges that Defendants have provided no assignment of those patent rights, which they allege apply only within Korea. Plaintiff further alleges that there is no evidence that any patent ever issued based on the international application. (AC ¶ 39(c).)

[8] Specifically, Mr. Carlucci allegedly learned that Uncle Ma was not simply an investor in Envion, as Mr. Han had previously represented. Rather, Uncle Ma and Mr. Han had allegedly entered into a purchase agreement whereby Uncle Ma would sell Envion certain rights that he owned to the technology underlying the Envion Oil Generator. However, that agreement is alleged to have been unconsummated because Mr. Han never paid Uncle Ma all of the money required.

Mr. Carlucci learned that Mr. Han did not use Mr. Carlucci's $20 million investment to buy out Mr. Han's uncle or for any legitimate business purposes. Rather, it is alleged that Mr. Han used the funds to move the company to Florida, a move that was made for reasons personal to Mr. Han. (AC ¶ 39(g).) Mr. Carlucci's investigation further revealed that Envion had not reached any "deal" with Gazprom or Petrobas and that, on information and belief, not only did Envion not have a backlog of 2,000 orders for its Oil Generator product, it had no deals in place through which a company could actually order (or had ordered) its Oil Generators. (AC ¶¶ 39(h)-(i).) Mr. Carlucci also learned none of the high-profile investors had invested in Envion, former President Bill Clinton had no affiliation with Envion nor had former President George W. Bush expressed an interest in investing in Envion. (AC ¶¶ 39(j)-(k).) Mr. Carlucci further discovered that Envion was on the brink of insolvency. (AC ¶ 39(l).)

It was at this point that Mr. Carlucci realized that Mr. Han had concealed material information from him when he solicited each of the October 2010 Note and the August 2011 Note. (AC ¶ 39(f).) Upon learning this information, Mr.

---

(AC ¶ 39(d).) The Amended Complaint alleges that Mr. Carlucci learned about the aforementioned agreement and subsequent dispute for the first time through discussions with Envion's former Chief Financial Officer, who was with the company from 2009 through early 2011 and was allegedly involved with the drafting of the agreement and in discussions with both Mr. Han and Uncle Ma about the dispute. (AC ¶ 39(e).)

Carlucci requested that Mr. Han allow an accountant to audit Envion's books, records, and intellectual property. (AC ¶ 40.) Mr. Han allegedly refused, and instead responded that he was too busy. Plaintiff alleges that, to date, Mr. Han has not given Mr. Carlucci access to Envion's books, records, or intellectual property. (*Id.*)

Plaintiff alleges that under the August 2011 Note, Envion was obligated to repay Mr. Carlucci's entire $32,393,000 investment, plus 5% interest, on August 4, 2012. (AC ¶ 41.) Plaintiff states that Envion failed to make the requisite payment and is in default of its obligations under the August 2011 Note. (*Id.*) Plaintiff further alleges that to date, Defendants have failed to repay any of Mr. Carlucci's $32,393,000 investment, or any of the interest on that investment required under the Note. (AC ¶ 42.) Mr. Carlucci alleges that as a direct and proximate result of Defendants' conduct, he has been damaged in an amount no less than $32,393,000. (AC ¶ 43.)

### B. Procedural Background

Plaintiff originally filed suit in this Court on April 24, 2012. [Dkt. 1.] Plaintiff's original Complaint asserted four causes of action: (1) securities fraud in violation of Section 10(b) of the Securities and Exchange Act of 1934 (the "'34 Act"), 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. §

240.10b-5 (Count I);[9] (2) securities fraud in violation of the

Virginia Securities Act, Va. Code § 13.1-501, *et seq.* (Count

II); (3) actual fraud (Count III); and (4) constructive

fraud/negligent misrepresentation (Count IV).

On June 8, 2012, Defendants filed a Motion to Dismiss

pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b)

and the Private Securities Litigation Reform Act of 1995

("PSLRA"), 15 U.S.C. § 78u-4(b). [Dkt. 10.] Plaintiff filed

his opposition on July 9, 2012, [Dkt. 32], to which Defendants

replied on July 17, 2012, [Dkt. 34]. On August 7, 2012, this

Court granted Defendants' Motion to Dismiss. [Dkt. 37.]

On August 17, 2012, Plaintiff filed an Amended

Complaint [Dkt. 39], asserting five cause of action: (1)

securities fraud in violation of Section 10(b) of the Securities

and Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b-

5, 17 C.F.R. § 240.10b-5 (Count I); (2) securities fraud in

violation of the Virginia Securities Act, Va. Code § 13.1-501,

*et seq.* (Count II); (3) actual fraud (Count III); (4)

constructive fraud/negligent misrepresentation (Count IV); and

(5) breach of contract. Defendants filed the instant Motion to

Strike and Partial Motion to Dismiss on August 28, 2012. [Dkt.

45.] Plaintiff filed their Opposition on September 10, 2012.

---

[9] Because the scope of Rule 10b-5 is coextensive with the coverage of Section
10(b), the Court will use "Section 10(b)" to refer to both the statute and
the rule. *See SEC v. Pirate Investor, LLC*, 580 F.3d 233, 237 n.1 (4th Cir.
2009)(citations omitted).

[Dkt. 47.]  Defendants filed a Reply to Plaintiff's Opposition on September 17, 2012.  [Dkt. 50.]

Defendants' Motions are now before the Court.

## II. Standard of Review

A. Rule 12(b)(6)

Rule 12(b)(6) allows a court to dismiss those allegations which fail "to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  A Rule 12(b)(6) motion tests the legal sufficiency of the complaint.  *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008).  A court reviewing a complaint on a Rule 12(b)(6) motion must accept well-pleaded allegations as true and must construe factual allegations in favor of the plaintiff.  *See Randall v. United States,* 30 F.3d 518, 522 (4th Cir. 1994).  In addition to the complaint, the Court may consider documents integral to and explicitly relied on in the complaint if the plaintiff does not challenge their authenticity.  *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004).  The Court may also take judicial notice of matters of public record.  *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)(quoting *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* To meet this standard, a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Twombly*, 550 U.S. at 555. "Factual allegations must be enough to raise a right to relief above the speculative level . . . ." *Id.* Moreover, a court "is not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678.

B. Rule 9(b)

Rule 9(b) imposes a heightened pleading standard for fraud claims. "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). To satisfy the heightened pleading standard of Rule 9(b), a plaintiff must state with particularity "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *In re Mut. Funds Inv. Litig.*, 566 F.3d 111, 120 (4th Cir. 2009)(quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999)), *rev'd sub nom. on other*

*grounds Janus Capital Grp., Inc. v. First Derivative Traders*,
131 S.Ct. 2296 (2011).

C. <u>PSLRA</u>

A plaintiff asserting a securities fraud claim
pursuant to Section 10(b) must meet the pleading requirements of
Rule 9(b) as well as those imposed by the PSLRA. *Iron Workers
Local 16 Pension Fund v. Hilb Rogal & Hobbs*, 432 F. Supp. 2d
571, 578 (E.D.Va. 2006). In order to survive a dismissal
motion, a securities fraud complaint must do more than state a
facially "plausible" claim under *Iqbal* and *Twombly*. Where a
defendant seeks dismissal of a securities fraud complaint, the
sufficiency of the complaint's allegations must be scrutinized
under the heightened pleading requirements set forth in the
PSLRA. Notably, the PSLRA requires a plaintiff to "specify each
statement alleged to have been misleading, the reason or reasons
why the statement is misleading, and, if an allegation regarding
the statement or omissions is made on information and belief, .
. . state with particularity all facts on which that belief is
formed." 15 U.S.C. § 78u-4(b)(1). The PSLRA also requires that
a plaintiff "state with particularity facts giving rise to a
strong inference that the defendant acted with the required
state of mind," *i.e.*, scienter. *Id.* § 78u-4(b)(2).
Specifically, the plaintiff must "plead facts rendering an
inference of scienter *at least as likely as* any plausible

opposing inference." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 328 (2007)(emphasis in original).

### III. Analysis

Regarding Defendants' Motion to Strike, Defendants assert that the Court should strike certain allegations made by Plaintiff in their Amended Complaint. Defendants allege that those allegations are subject to this Court's finding in its Memorandum Opinion relating to the dismissal of Plaintiff's original Complaint that they are "non-actionable." As the Amended Complaint reincorporates those allegations, Defendants believe that material should be stricken from the Plaintiff's Amended Complaint.

Regarding Defendants' Motion to Dismiss, Defendants allege that Plaintiff has failed to plead key components of certain claims brought in the Amended Complaint. First, Defendants allege that Plaintiff has failed to plead loss causation as to Counts I, II, III, and IV of the Amended Complaint. Second, Defendant asserts that Plaintiff has failed to plead reasonable reliance as to Counts I, III, and IV of the Amended Complaint. Third, Defendants assert that Plaintiff has failed to adequately plead falsity. Fourth, Defendants assert that Plaintiff has failed to plead scienter with particularity. The Court will address each argument in turn.

A. <u>Defendants' Motion to Strike</u>

Defendants assert that the Court should strike certain allegations made by Plaintiff in their Amended Complaint as subject to this Court's finding in its Memorandum Opinion relating to the dismissal of Plaintiff's original Complaint that they are "non-actionable." [Dkt. 36.] Defendants list the following alleged misrepresentations as subject to the Court's finding:

> (a) that Mr. Han had communicated with numerous investors who were interested in investing with Envion, including Warren Buffet, Bill Gates, Dow Chemical, Morgan Stanley, and Goldman Sachs;

> (b) that former President Bill Clinton had agreed to become affiliated with Envion, possibly as a member of its board of directors, and that former President George W. Bush was interest in investing in Envion;

> (c) that along with Han, Envion was run by a number of seasoned and highly regarded executives with extensive track records of success in the energy, technology, and finance industries, as well as the public sector; and

> (d) that Envion would be the best return Mr. Carlucci had received on any investment, that Mr. Carlucci would get his investment back in three weeks, and that Mr. Carlucci would receive possibly up to 50 times the amount invested.

(Def. Mot. 7)(internal quotations omitted).

Under Federal Rule of Civil Procedure 12(f), a court may, on its own motion or by motion of a party, "strike from a

pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." The purpose of a motion to strike is "to clean up the pleadings, streamline litigation, and avoid unnecessary forays into immaterial matters." *McInerney v. Moyer Lumber & Hardware, Inc.*, 244 F.Supp.2d 393, 402 (E.D.Pa. 2002).

Having already determined that the aforementioned statements are not actionable, this Court believes that the statements in the submitted Amended Complaint are immaterial to substantive matters pending before this Court. Consequently, Defendants' Motion to Strike is granted.

B. Whether Plaintiff's Claims are Adequately Pled

Defendants allege a number of pleading deficiencies. First, Defendants allege that Plaintiff has failed to plead loss causation as to Counts I, II, III, and IV of the Amended Complaint. Second, Defendants assert that Plaintiff has failed to plead reasonable reliance as to Counts I, III, and IV of the Amended Complaint. Third, Defendants assert that Plaintiff has failed to plead falsity adequately as to Counts I, II, III, and IV of the Amended Complaint. Fourth, Defendants assert that Plaintiff has failed to plead scienter adequately as to Counts I, II, III, and IV of the Amended Complaint.

1. Section 10(b) Claim

Section 10(b) forbids the "use or employ, in

connection with the purchase or sale of any security [. . .]
[of] any manipulative or deceptive device or contrivance in
contravention of such rules and regulations as the [SEC] may
prescribe as necessary or appropriate in the public interest or
for the protection of investors." 15 U.S.C. § 78j(b). SEC Rule
10b–5 implements Section 10(b) by making it unlawful:

> (a) To employ any device, scheme, or
> artifice to defraud,
>
> (b) To make any untrue statement of a
> material fact or to omit to state a
> material fact necessary in order to
> make the statements made, in the light
> of the circumstances under which they
> were made, not misleading, or
>
> (c) To engage in any act, practice, or
> course of business which operates or
> would operate as a fraud or deceit upon
> any person,
>
> in connection with the purchase or sale
> of any security.

17 C.F.R. § 240.10b–5. Section 10(b) affords, by implication, a
right of action to securities purchasers or sellers injured by
its violation. *Tellabs*, 551 U.S. at 318.

A plaintiff bringing a Section 10(b) claim "must
typically prove: '(1) a material misrepresentation or omission
by the defendant; (2) scienter; (3) a connection between the
misrepresentation or omission and the purchase or sale of a
security; (4) reliance upon the misrepresentation or omission;
(5) economic loss; and (6) loss causation (that is, the economic

loss must be proximately caused by the misrepresentation or omission)." *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 181 (4th Cir. 2009) (quoting *Stoneridge Inv. Partners, LLC, v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).

### i. Loss Causation

Loss causation "is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group., Inc.*, 343 F.3d 189, 197 (2nd Cir. 2003); *see also Miller v. Asensio & Co.*, 364 F.3d 223, 232 (4th Cir. 2004). To show loss causation, a securities-fraud plaintiff must demonstrate that the "defendant's misrepresentation was a substantial cause of the loss by showing a direct or proximate relationship between the loss and the misrepresentation." *In re PEC Solutions, Inc. Sec. Litig.*, 418 F.3d 379, 387 (4th Cir. 2005) The statute does not require a plaintiff to prove that the defendant's fraud was the sole cause of the plaintiff's loss. "The facts alleged in the complaint . . . need not conclusively show that the securities' decline in value is attributable solely to the alleged fraud rather than to other intervening factors." *In re Mut. Funds Inv. Litig.*, 566 F.3d at 128. Rather, a plaintiff need only prove that defendant's misrepresentation was a substantial cause of the loss by showing

"[a] direct or proximate relationship between the loss and the misrepresentation." *Miller*, 364 F.3d at 232 (quoting *Gasner v. Bd. of Supervisors*, 103 F.3d 351, 360 (4th Cir. 1996).

Loss causation must be pled with "'sufficient specificity,' a standard largely consonant with [Rule] 9(b)'s requirement that averments of fraud be pled with particularity." *Katyle v. Penn Nat'l Gaming, Inc*., 637 F.3d 462, 471 (4th Cir. 2011). The degree of specificity required is that which will "enable the court to evaluate whether the necessary causal link exists." *Id* (quoting *Teachers' Ret. Sys. Of LA. v. Hunter*, 477 F.3d 162, 186 (4th Cir. 2007)).

As a general matter, "[t]he loss causation requirement must be applied on a case-by-case basis." *Robbins v. Koger Properties, Inc.*, 116 F.3d 1441, 1447 (11th Cir. 1997). Whether the plaintiff has proven causation is usually reserved for the trier of fact. *See, e.g., Huddleston v. Herman & MacLean*, 640 F.2d 534, 549-50 (5th Cir. 1981). It must also be noted that "[l]oss causation becomes most critical at the proof stage." *McCabe v. Ernst & Young*, LLP, 494 F.3d 418, 427 n. 4 (3rd Cir. 2007)(internal quotation marks omitted); *see also In re Mut. Funds Inv. Litig.*, 566 F.3d at 128 ("it is during the damages inquiry, not the earlier proximate cause inquiry, that the exact amount of damages solely caused by the defendant's conduct must be calculated")(emphasis in original)(internal quotation marks

omitted). "So long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings when the plaintiff's case can be rejected on evidentiary grounds." *In re Gilead Sciences Secs. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

In essence, Plaintiff alleges that Mr. Carlucci relied upon and was fraudulently induced by Mr. Han's allegedly false or misleading misrepresentations in initially investing and continuing to invest in Envion, a company with which he would not have otherwise endowed his investment had he been aware of the true state of their business, at a price fraudulently and artificially inflated by those misrepresentations, and has thereby suffered economic damages in the loss of his investments. Indeed, the Amended Complaint expressly alleges that "Plaintiff's reliance upon Defendants' misrepresentation was the proximate cause of injury ..." and that "Plaintiff suffered substantial damages and pecuniary loss as a direct and proximate result of the fraudulent conduct of Defendants...." (AC ¶¶ 54-55.) The Amended Complaint further alleges that "[a]s a direct and proximate result of the ... conduct of Envion and Mr. Han, Mr. Carlucci has been damaged in an amount of no less than $32,393,000." (AC ¶ 43.)

Regarding the value of Mr. Carlucci's investments, the Amended Complaint alleges that "[b]ecause Mr. Han's representations about the patent and business deals were false, Mr. Carlucci's investment was worth far less than the $32,393,000 he invested" and that the investments are now likely worthless. (AC ¶ 44.) As for Envion's current investment value, Plaintiff has noted that his investigation of Envion's finances, allegedly performed in "late March and mid-April 2012" and without Defendants' cooperation, revealed Envion's financial situation to be dire and the company was on the brink of insolvency. Indeed, the Amended Complaint states that Plaintiff's investigation revealed "Envion had at most a few months of available resources before it would before it would be completely insolvent and unable to pay any of its obligations." (AC ¶ 39(l).) This information was allegedly stated by Mr. Lavigne du Cadet, who then relayed to Mr. Carlucci that Mr. Han had told him that Envion at that time only had enough funding to keep the company going for three more months.[10] (*Id.*) Similar information is also attributed to the former Chief Financial Officer of Envion.[11] (AC ¶ 24(c).) Plaintiff further cites the

---

[10] The Amended Complaint also states that Mr. Carlucci has attempted to inspect and audit internal financial, intellectual property, and records books of Envion in order to ascertain the company's precise state of affairs. Mr. Han has allegedly refused his requests. (AC ¶ 40.)

[11] Regarding Envion's unnamed former Chief Financial Officer to whom Plaintiff has attributed information, this Court believes that the Amended Complaint describes this individual "with sufficient particularity to support the

non-payment of the August 2011 Note, under which Envion was obligated to repay Mr. Carlucci's entire $32,393,000 investment (plus 5% interest) on August 4, 2012 as evincing economic loss. (AC ¶ 42.)

There is considerable disagreement among the parties as to what precisely Plaintiff is required to allege in their Amended Complaint in order to plead loss causation. Defendants argue that Supreme Court's holding in *Dura Pharmaceuticals, Inc. v. Broudo* is applicable to the instant case and that, as a consequence, Plaintiff has failed to establish loss causation.[12]

Indeed, there exists little consistent, definitive guidance capable of ready application to the current factual scenario. The facts of this case do not represent a typical securities fraud scenario such as one involving publically traded securities and/or "fraud on the market."[13] Here, the subject company is privately held and its securities are not publically traded. To be sure, there exists some uncertainty

---

probability that a person in the position occupied by the source would possess the information alleged." *Teachers'*, 477 F.3d at 174.

[12] The Supreme Court held in *Dura* that an investor may not establish loss causation merely by alleging that a security price was artificially inflated because of misrepresentation. *See Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 346-48 (2005).

[13] "The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. ... Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements. ... The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations." *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42. 2d 194 (1988).

amongst the courts of the United States regarding the applicability of the Supreme Court's holding as to loss causation in *Dura* to privately offered corporate securities that are not publically traded.[14]  In contrast to the factual posture of the instant case, the securities of the subject company in *Dura* were publically traded.  Courts have recognized the significance of this difference and measured the practical economic characteristics of privately held securities that differentiate them from those that are traded on the market. *See, e.g., WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1053 (9th Cir. 2011)("[w]ith a privately held company, a comparison of market stock price to establish loss causation has less relevance because market forces will less directly affect the sales prices of the shares of a privately held company."); *Brown v. Earthboard Sports USA*, 481 F.3d 901, 920 (6th Cir. 2007)("a small private offering is far more

_____

[14] In *Dura*, respondents were individuals that purchased stock in the subject corporation between April 15, 1997 and February 24, 1998, and subsequently brought a securities fraud action against Dura Pharmaceuticals, Inc. ("Dura") as corporate entity, as well as certain managers and directors, in federal court. Their amended complaint alleged that Dura or its officials made false statements concerning Dura's drug profits and the future Food and Drug Administration ("FDA") approval of a new asthmatic spray device.  Dura allegedly falsely claimed both that it expected its drug sales would be profitable and that it expected that the FDA would soon grant its approval to the asthmatic spray device. On the last day of the purchase period, February 24, 1998, Dura announced that, primarily due to slow drug sales, its earnings would be lower than expected.  The next day, Dura's shares fell from $39 per share to about $21, as loss of almost half of their value.  Subsequently, in November 1998, Dura announced that the FDA would not approve Dura's new asthmatic spray device.  The next day, Dura's share price fell temporarily but recovered with one week.  In their complaint, respondents attributed their economic loss to their purchase of Dura securities at artificially inflated prices.  *Dura*, 544 U.S. at 340.

subject than shares trading on large public markets to initial purchase prices that are inflated fraudulently.")

This Court believes that the instant case is factually distinguishable from *Dura*. In *Dura*, with respect to economic loss attributable to misstatement, the complaint alleged nothing more than that "[i]n reliance on the integrity of the market, [the plaintiffs] ... paid artificially inflated prices for Dura securities" and that the plaintiffs suffered "damage[s]" thereby." *Dura*, 544 U.S. at 340-41. Plaintiff's Amended Complaint in this case, however, cannot be said to be analogously deficient as the complaint in *Dura*. Here, Plaintiff has not merely asserted in their Amended Complaint that their purchase of the subject securities at an artificially inflated price establishes requisite loss causation, but has pleaded that the Defendants' misrepresentations directly and proximately caused the losses that they sustained.[15] This exceeds the pleadings of the complaint in the *Dura* case. Furthermore, *Dura* expressly stated that the Court neither considered nor intended to consider "other proximate cause or loss-related questions." *Id* at 346. Consequently, this Court does not find *Dura* to be controlling the factual circumstances of the instant case.

---

[15] Indeed, the Amended Complaint expressly alleges this causal connection. Specifically, Plaintiff alleges that their reliance upon Mr. Han's false or misleading misrepresentations and omissions in investing and continuing to invest in Envion directly and proximately caused their economic loss. (AC ¶¶ 53-55.)

This Court finds that Plaintiff has sufficiently pleaded loss causation. Plaintiff has sufficiently alleged that Mr. Han's repeated misrepresentations induced Mr. Carlucci's continued investment in Envion, and that Mr. Carlucci's reliance upon those misrepresentations was the proximate cause of his injury. The Court finds this theory to be plausible. Having noted the near-insolvency of Envion, and the non-payment of the October 2010 Note and the August 2011 Note, Plaintiff has further identified economic loss substantially attributable to the misrepresentations of Mr. Han.[16] Having found that the requisite causal link exists at this stage, this Court will not belabor its analysis of the allegations of the Amended Complaint as they relate to loss causation. As this Court has previously noted, its "skepticism is best reserved for later stages of the proceedings when the plaintiff's case can be rejected on evidentiary grounds." *Gilead Sciences*, 536 F.3d at 1057. Consequently, this Court finds that Plaintiff has adequately pleaded loss causation.

## ii. Falsity and Scienter

Section 10(b) requires that a defendant act deceptively in order to fall within the purview of the statute. *U.S. S.E.C. v. Pirate Investor LLC*, 580 F.3d 233, 239-40 (4th

---

[16] The Court notes that it is not necessary to determine the precise amount of damages solely caused by Defendants' conduct at this stage in the proceedings. *See, e.g., In re Mut. Funds Inv. Litig.*, 566 F.3d at 128.

Cir. 2009)(quoting *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 473 (1977)("The language of § 10(b) gives no indication that Congress meant to prohibit any conduct not involving manipulation or deception."). Deceptive acts include misstatements, omissions by those with a duty to disclose, manipulative trading practices, and deceptive courses of conduct. *Id* (quoting *Stoneridge Inv. Partners*, 552 U.S. at 158).

The PSLRA provides that in pleading a material misrepresentation or omission, in violation of Section 10(b) of the Exchange Act and Rule 10b-5, and the scienter necessary to such a misrepresentation or omission, the plaintiff must plead facts. *Teachers'*, 477 F.3d at 172. While the Federal Rules of Civil Procedure generally allow a court, in ruling on a motion to dismiss under Rule 12(b)(6), to take into account any set of facts that could be proved consistent with the allegations of the complaint, even though such facts have not been alleged in the complaint, the PSLRA modifies this scheme (1) by requiring a plaintiff to plead facts to state a claim and (2) by authorizing the court to assume that the plaintiff has indeed stated all of the facts upon which he bases his allegation of a misrepresentation or omission. *Id* (citing 15 U.S.C. § 78u-4(b)(1)). However, if "the plaintiff fails to allege *all* facts but does allege *sufficient facts* to support a *reasonable belief* in the allegation that the defendant's statement was misleading,

33

the court should deny the Rule 12(b)(6) motion as to this 'misrepresentation' element." *Teachers'*, 477 F.3d at 174 (emphasis in original). Thus, a plaintiff must allege: (1) each misleading statement; (2) the reasons each statement was misleading; and (3) when an allegation regarding such a statement is based on information and belief, "with particularity all facts on which that belief is formed." *Id* at 173.

As a general matter, determining whether the Amended Complaint satisfies this standard necessarily entails a case-by-case assessment of the Amended Complaint as a whole. This Court will consider the number and level of detail of the facts; the plausibility and coherence of the facts; whether sources of the facts are disclosed and the apparent reliability of those sources; and any other criteria that inform how well the facts support the plaintiff's allegation that defendant's statements or omissions were misleading. *Id* at 174. When a complaint chooses to rely on facts supported by confidential sources, it must describe the sources "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged..." *Id*.

Although it is generally accepted that stating a cause of action for securities fraud under Section 10(b) entails a rigorous pleading standard, it is not necessary for Plaintiff to

prove absolute, incontrovertible falsity at the motion to dismiss stage, contrary to the seeming contention of the Defendants. The construction of §78u-4(b)(1) requires a plaintiff to allege *sufficient facts* to support a *reasonable belief* in the allegation that a defendant's statement was misleading. This tests only the legal sufficiency of the complaint and logically follows from the inquiry required by Rule 12(b)(6). Consequently, the appropriate inquiry under the PSLRA becomes, if those facts alleged in a complaint are true, whether relief could be granted on the plaintiff's claim. *Id* at 173.

Scienter constitutes the second element of a securities fraud claim under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. In a securities fraud action, "the term 'scienter' refers to a mental state embracing intent to deceive, manipulate, or defraud." *Ottmann v. Hanger Orthopedic Group, Inc.*, 353 F.3d 338, 343 (4th Cir. 2003)(quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n.12 (1976)). The Fourth Circuit has held that a plaintiff may allege the required state of mind, or scienter, for securities fraud liability by pleading intentional misconduct or recklessness. "Scienter exists if the defendant knew the statement was misleading or knew of the existence of facts which, if disclosed, would have shown it to be misleading." *Banca Cremi, S.A. v. Alex Brown & Sons, Inc.*,

132 F.3d 1017, 1037 n. 26 (4th Cir. 1997); *see also Ottmann*, 353 F.3d at 344; *Phillips*, 190 F.3d at 620; *Teachers'*, 477 F.3d at 184 ("a plaintiff must allege that the defendant made the misleading statement or omission intentionally or with 'severe recklessness' regarding the danger of deceiving the plaintiff.") Negligent speakers avoid liability under this regime. *See Pirate Investor*, 580 F.3d at 241. For purposes of Section 10(b), a reckless act is one "so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Matrix Capital*, 576 F.3d at 181 (quoting *Pub. Emps.' Ret. Ass'n of Colo. v. Deloitte & Touche LLP*, 551 F.3d 305, 313 (4th Cir. 2009)).

With respect to forward-looking statements and opinions, however, the standard is higher. In those cases, the plaintiff must allege facts demonstrating that the statement was made with actual knowledge of its falsity. *See* 15 U.S.C. § 78u-5(c)(1)(B)(i) (for forward-looking statements, a plaintiff must prove that the statement "was made with actual knowledge by that person that the statement was false or misleading"); *Nolte v. Capital One Fin. Corp.*, 390 F.3d 311, 315 (4th Cir. 2004)(in order to plead that an opinion is a false statement in a securities fraud case, "the complaint must allege that the

opinion expressed was different from the opinion actually held by the speaker")(citing *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1093 (1991))).

The PSLRA significantly strengthened the requirements for pleading scienter. *Teachers'*, 477 F.3d at 184. While under Rule 9(b) a person's state of mind "may be alleged generally," Fed. R. Civ. P. 9(b), the PSLRA requires a plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2). Congress enacted this more stringent pleading standard "to curtail the filing of meritless lawsuits" and to create a uniform pleading standard among the circuits. *See* H.R. Conf. Rep. No. 104-369, at 41 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 740. The PSLRA thus "seek[s] to heighten the standard for pleading scienter, and so changes what a plaintiff must plead in his complaint in order to survive a motion to dismiss." *Ottmann,* 353 F.3d at 344. A plaintiff cannot merely plead facts from which a reasonable person could infer that the defendant acted with scienter; rather, the plaintiff must "plead with particularity facts that give rise to a 'strong' -- *i.e.*, a powerful or cogent -- inference." *Tellabs*, 551 U.S. at 323; *see also In re PEC Solutions*, 2004 WL 1854202, at *14 ("Plaintiffs' allegations of scienter fail because the Court cannot simply

infer or imply knowledge of material facts based upon conclusory allegations."), *aff'd* 418 F.3d 379 (4th Cir. 2005).

In delineating the sort of particular facts that give rise to a "strong inference" of the requisite scienter, the Second Circuit has stated:

> A "strong inference" that defendants acted with scienter arises, for example, where a plaintiff sufficiently alleges that a defendant benefited in a concrete and personal way from the fraud, engaged in deliberately illegal behavior, knew facts or had access to information suggesting his public statements were not accurate, or failed to check information that he had a duty to monitor. Furthermore, opinions or predictions can be the basis for scienter "if they are worded as guarantees ... or if the speaker does not genuinely or reasonably believe them."

*In re IBM Corporate Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998)(citations omitted). As the Supreme Court explained in *Tellabs*, in determining whether the alleged facts give rise to a 'strong' inference of scienter, courts must take into account plausible opposing inferences. *Id.* at 323-24. "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. If the inference that a defendant "acted innocently, or even negligently, [is] more compelling than the inference that they acted with the requisite scienter," then the complaint must

be dismissed. *Pub. Employees' Ret. Ass'n of Colo.*, 551 F.3d at 313.

This determination entails an evaluation as to "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets [the "strong inference"] standard." *Tellabs*, 551 U.S. at 322–24. The scienter inquiry entails a "holistic" assessment of the Complaint that ascribes to the allegations with "the inferential weight warranted by context and common sense." *Matrix Capital*, 576 F.3d at 183. Proof of scienter therefore need not invariably be direct, but may be inferred from circumstantial evidence. *Malone v. Microdyne Corp.*, 26 F.3d 471, 479 (4th Cir. 1994).

a. Alleged representation that "Envion had the exclusive patent for the Envion Oil Generator"

Plaintiff alleges that Mr. Han's representation that "Envion had the exclusive patent for the Envion Oil Generator" is false. This Court will consider the factual allegations of the Amended Complaint in making its determination as to falsity for the purposes of pleading.

Addressing a threshold issue of considerable importance, there does not exist at this point in the proceedings any substantive record of Envion owning a patent for

the Envion Oil Generator in any location worldwide, exclusive or otherwise.  Within the United States, Plaintiff alleges that a patent search has not shown that Mr. Han or Envion owns or has ever owned an exclusive patent to the Envion Oil Generator technology.  A provisional patent application was filed with the United States Patent and Trademark Office in March 2012, well after the representations of Mr. Han are alleged to have been made.  Furthermore, a provisional patent application constitutes a filing from which a patent does not actually issue.  Plaintiff has submitted a document, allegedly produced by Mr. Han, entitled "Envion Projects, October 2011 – March 2012". It seemingly shows that Envion was only then filing or contemplating filing patent applications in the United States, Brazil, and an unspecified "35 European countries."  Mr. Han's alleged production of such a document weighs in favor of the determination that his representation relating to Envion's patent ownership was false or misleading.

As to the possibility that there exists either a Korean patent for the Envion Oil Generator technology, an argument raised by Defendants within the context of their Motion to Dismiss the original Complaint, Plaintiff alleges that the document identifies neither Envion nor Mr. Han as inventors or owners of the Korean patent rights for the Envion Oil Generator

technology.[17]  Instead, the patent identifies the inventor as

"Myung Duck Ma."[18]  It is alleged that Defendants have "produced

no assignment of these limited patent rights (which apply, if at

all, only within Korea) to Mr. Han or Envion."  Plaintiff

alleges that, in contrast to Mr. Han's characterization of Mr.

Ma as merely an investor in Envion, Mr. Ma and Mr. Han were

actually parties to a purchase agreement whereby Mr. Ma would

sell his ownership stake to certain technological rights to the

Envion Oil Generator technology to Envion.  Plaintiff alleges

that any rights that could even potentially inure to Envion or

Mr. Han from this alleged Korean patent are subject to dispute,

as the purchase agreement was never consummated.[19]

As to the possibility that a patent exists with the

World Intellectual Property Office, Plaintiff alleges that there

is no evidence that a patent has ever issued based on the

international application. To be sure, patent applications are

public records subject to judicial notice, and this Court has

previously taken judicial notice in this case of the patent

---

[17] Defendants have previously argued that the alleged misrepresentation
regarding Envion's patented technology is not false because its technology
is, in fact, patented.  In support of this assertion, Defendants previously
attached to their first Motion to Dismiss a copy of a Korean patent, as well
as a patent application filed with the World Intellectual Property Office.
[18] Plaintiff states that this individual is the eponymous "Uncle Ma."
[19] Mr. Carlucci allegedly learned about the aforementioned agreement and
subsequent dispute with Uncle Ma as a result of his own investigation, as
well as through discussions with Envion's former Chief Financial Officer, who
was allegedly "involved with the drafting of the agreement and in discussions
with both Mr. Han and Uncle Ma about the dispute."  (AC ¶ 39(e).)

application filed with the World Intellectual Property Office.[20]
As this Court wrote in its Memorandum Opinion on Defendants'
first Motion to Dismiss, while the document lists Envion as the
applicant, it does not demonstrate that a patent ever actually
issued based on the application.

Viewing the alleged facts in the light most favorable
to Plaintiff, the Court finds that Plaintiff has pleaded
sufficient facts to permit a reasonable belief that Mr. Han's
representation of exclusive patent ownership was false or
misleading.  Accepting the allegations of the Amended Complaint
as true for the purposes of this Motion, Envion does not
actually own an exclusive patent to the technology underlying
the Envion Oil Generator.  While the Plaintiff has been tasked
with alleging facts to support the nonexistence of a patent, an
onerous task in the context of a proceeding requiring
allegations of substantive facts, the Court believes absence of
an exclusive patent has been adequately alleged by Plaintiff.

Addressing the second element necessary to state
Section 10(b) claim for securities fraud, the Court believes
that the Plaintiff has alleged facts that give rise to a strong
inference of the requisite scienter.  Having considered the
foregoing facts collectively, this Court believes that they
demonstrate that Mr. Han was, at best, severely reckless in

---

[20] *See CYBERsitter, LLC v. People's Republic of China*, 805 F. Supp. 2d 958,
963 (C.D. Cal. 2011).

representing to Mr. Carlucci that "Envion had the exclusive patent for the Envion Oil Generator" when there exists no record of such a patent whatsoever.  In the Amended Complaint, Plaintiff expressly alleges that "Mr. Han unquestionably knew [the representations] to be false when made as the founder, Chairman, and CEO of Envion, and person who controlled all information at the company about such matters."  (AC ¶ 15.) This is not, as Defendants seem to characterize, simply an assertion that Mr. Han knew by virtue of his position.  Although a defendant's position, standing alone is not sufficient to permit a strong inference of scienter, Plaintiff alleges that Mr. Han actually possesses and controls the correct information, yet nevertheless falsely or misleadingly represented contradictory impressions to Mr. Carlucci.  Consequently, the Amended Complaint does not merely rely upon Mr. Han's position in Envion as imputing scienter to Mr. Han; rather, the Complaint expressly alleges that Mr. Han possessed the "true" information as to the state of Envion's business, and intentionally and knowingly made false or misleading representations that contravene that true information in his possession.

Furthermore, the document issued to Mr. Carlucci on behalf of Mr. Han and Envion in late March or April of 2012 seemingly demonstrates that the patent application process was only then commencing in those listed locales, warranting a

strong inference that Mr. Han knowingly and intentionally misrepresented Envion's intellectual property ownership to Mr. Carlucci throughout the course of their discussions.

Plaintiff also alleges that Mr. Han was motivated by a desire to deceive Mr. Carlucci and by this means induce him into investing in his company, thereby acquiring funds with which to continue to live a "lavish lifestyle." As this Court has mentioned in the foregoing statement of applicable law, motive is a relevant consideration to scienter analysis.[21] Mr. Han's representation of positive patent ownership resounds with Mr. Han's alleged motivation for deceiving Mr. Carlucci in the sense that patent ownership would no doubt increase the attractiveness of Envion as an investment.

Viewing the factual allegations in a light favorable to the Plaintiff, and considering *in toto* the factual allegations of the Amended Complaint, this Court believes that that there exists a strong inference that Plaintiff acted with the requisite scienter. It is certainly conceivable from the facts that Mr. Han could have acted intentionally in misrepresenting the state of Envion's patent ownership. At the very least, this Court believes that the alleged facts give rise to a strong inference Mr. Han acted recklessly in representing

---

[21] The Fourth Circuit has expressly deemed motive to constitute a relevant inquiry as to scienter. *See*, *e.g.*, *Ottmann*, 353 F.3d at 345-46; *see also In re PEC Solutions*, 2004 WL 1854202, at *14.

to Mr. Carlucci that Envion possessed an "exclusive patent to the Envion Oil Generator technology."

> b. Alleged representation that "Envion had a 'done deal with Gazprom'"

Representations about business dealings may be actionable when properly supported by facts demonstrating their falsity. For example, in *Dunn v. Borta*, 369 F.3d 421, 431 (4th Cir. 2004), the Fourth Circuit held that representations that the defendant was in negotiations with certain distributors -- all major companies -- were material. As this Court found in its prior Memorandum Opinion, representations regarding the defendant's "business dealings and prospects are not simply sales pitches but rather can be proven true or false -- and, if properly supported, could be found material by a reasonable jury." *Id.; see also Cooke v. Manufactured Homes, Inc.*, 998 F.2d 1256, 1259 (4th Cir. 1993)(representations about specific business projects, including negotiation of a profitable contract with an insurer, deemed actionable).

Plaintiff has pleaded sufficient facts that permit a reasonable belief that Mr. Han's statement that Envion had a "done deal" with Gazprom was false or misleading. Plaintiff has based his allegations upon, in part, information acquired from Mr. Lavigne du Cadet through his third-party consultation of Envion, which entailed extensive discussions with Mr. Han and

participation in the negotiation of energy agreements with a
foreign energy conglomerate, from as well as Envion's former
Chief Financial Officer, who is alleged to have had personal
knowledge of Envion's business dealings at the time.[22] This
Court believes that it is probable that these individuals would
possess the information alleged. Indeed, Plaintiff has
expressly alleged that Mr. Lavigne du Cadet informed him of the
nonexistence of any such deal with Gazprom. Plaintiff has
further supplemented their allegations by stating that their own
investigation has demonstrated that no such agreement exists.
Defendants have not offered anything to contradict this notion,
and do not contend that any such agreement exists. Rather,
Defendants assert that the present nonexistence of such an
agreement does not necessarily mean that it never existed.
However, Defendants have no offered any substantive facts or
information that demonstrate their inference that any agreement
such as the one represented existed at any point in the past.

Plaintiff has been tasked with the difficult burden of
alleging facts that demonstrate the nonexistence of an
agreement, an endeavor that does not necessarily lend itself to
the production of substantive facts or evidence to support their

---

[22] Once again, regarding Envion's unnamed former Chief Financial Officer to
whom Plaintiff has attributed information, this Court believes that the
Amended Complaint describes this individual "with sufficient particularity to
support the probability that a person in the position occupied by the source
would possess the information alleged." *Teachers'*, 477 F.3d at 174.

contention.  Nevertheless, viewing the alleged facts in a manner most favorable to the Plaintiff permits a reasonable belief that Mr. Han's representation was false or misleading.

As to the second element of a securities fraud claim, viewing the factual allegations of the Amended Complaint in a light most favorable to the Plaintiff, the Court believes that the Plaintiff has alleged facts that give rise to a strong inference of the requisite scienter.

Touching upon an issue covered in the Court's foregoing analysis, Plaintiff alleges that Mr. Han actually possesses the relevant information as to Envion's business dealings and finances, information that he has refused to divulge to Mr. Carlucci.  From this factual allegation, knowledge may be imputed to Mr. Han as to the true state of Envion's business with Gazprom, whatever that may be in actuality.  In addition, Mr. Carlucci also obtained information from Mr. Lavigne du Cadet as Envion's business dealings, who in turn derived that information from participation in negotiating business deals on behalf of Envion and discussions with Mr. Han himself.  This allegation further serves to impute to Mr. Han knowledge to Mr. Han.  Additionally, this Court believes the fact that Mr. Han repeatedly made the representation that Envion had a consummated a valuable agreement with Gazprom when, in reality, there is no evidence that such an agreement exists or

has ever existed, evinces a strong inference that Mr. Han acted with the requisite scienter.  Furthermore, touching upon Mr. Han's present behavior, it is the estimation of this Court that Mr. Han's continued unwillingness to allow Mr. Carlucci to inspect company records and other documents in order to ascertain the true state of Envion's business agreements (if any), even in the face of mounting investor scrutiny and distrust, implies conscious suppression of the truth and further evinces that Mr. Han acted intentionally and with a culpable knowledge in misrepresenting the supposed "done deal" with Gazprom to Mr. Carlucci.  Finally, Plaintiff alleges that Mr. Han was motivated by a desire to induce Mr. Carlucci into investing in his company, thereby acquiring funds with which to continue to live a "lavish lifestyle."  Mr. Han's representation comports with his alleged motive in the sense that the existence of an agreement such as the one represented by Mr. Han, involving a "sizable investment" from Gazprom, would reflect positively upon the value of Envion as an investment.   As this Court has mentioned in its foregoing analysis, motive is relevant to scienter analysis, and this Court believes that it weighs in favor of the existence of a strong inference of the requisite scienter.

   Viewing the totality of the factual allegations in a light favorable to the Plaintiff, and considering *in toto* the

factual allegations of the Amended Complaint, this Court believes that that Plaintiff alleged facts that give rise to a strong inference of the existence of the requisite scienter. Indeed, there exists a strong inference that Mr. Han possessed the relevant information as the state of negotiations and, at the very least, acted recklessly in representing to Mr. Carlucci that Envion had a "done deal" with Gazprom. As is the case with Mr. Han's representation regarding the state of Envion's patent ownership, the potential exists from the alleged facts that Mr. Han may have intentionally misrepresented Envion's relationship with Gazprom to Mr. Carlucci. However, recklessness represents the minimum threshold to plead scienter and the Court finds that a strong inference of it exists here.

> c. <u>Alleged representation that Envion was "close" to closing a specified deal with Petrobas</u>

The Court finds that Plaintiff has sufficiently pleaded facts to permit a reasonable belief in the falsity of Mr. Han's representation that Envion was then "close" to closing a deal with Petrobas that was to consist of (i) an off-take agreement, under which Envion would provide Envion Oil Generators to Petrobas; and (ii) a joint venture, under which Petrobas would invest "substantial sums of money" in Envion. Plaintiff relies on the impressions of Mr. Lavigne du Cadet, the third-party energy consultant that participated personally in

discussions between Envion and Petrobas in late March of 2012, in alleging that Mr. Han's representation was either false or misleading. Mr. Lavigne du Cadet allegedly told Mr. Carlucci that, based on his personal participation in discussions with Envion and Petrobas, talks that also included Mr. Han, that there was no reasonable basis for believing that a deal such as the one described by Mr. Han would materialize. The Court notes that the temporal interim between Mr. Han's last instance of having made the instant representation and Mr. Lavigne du Cadet's participation as a third-party consultant in those discussions was not unreasonably long. Indeed, Mr. Lavigne du Cadet's observance that the represented agreement between Envion and Petrobas was non-existent, not being negotiated, and that there was no reasonable basis for concluding are based upon first-hand observance of discussions between the two corporate entities, and this Court believes that his impressions lend considerable credence to Plaintiff's allegation that Mr. Han's representation was false or misleading.[23] Considering the factual allegations in a manner favorable to the Plaintiff, this Court is satisfied that this aforementioned representation is capable of being be proven true or false by a jury and that the

---

[23] The last alleged instance of Mr. Han having represented that Envion and Petrobas were "close" to a deal was "in the summer of 2011," in connection with the issuance of the August 2011 Note. (AC ¶ 25.) Mr. Lavigne du Cadet participated in the meetings between Mr. Han and representatives of Petrobas on or about "March 22 and 23, 2012." (AC ¶ 34.)

alleged facts permit a reasonable belief that Mr. Han's representation was false or misleading.

As to the second element of the present analysis, this Court believes that the factual allegations posited by Plaintiff give rise to a strong inference that Mr. Han made the representations with the required scienter. Revisiting an issue touched upon earlier, Plaintiff has alleged that Mr. Han is in possession and control of the relevant information as to Envion's business dealings, information which he allegedly refuses to disclose. Mr. Han's repeated representations to Mr. Carlucci as to the state of negotiations with Petrobas, coupled with his undisputed personal involvement in those discussions, impute to Mr. Han knowledge of the true state of those negotiations, and further evince culpable knowledge that his respective representations regarding the state of those negotiations to Mr. Carlucci were misleading, if not outright false. Furthermore, as to the issue of Mr. Han's motive, Plaintiff alleges that Mr. Han was motivated by a desire to deceive Mr. Carlucci and by this means induce him into investing in his company, thereby acquiring funds with which to continue to live a "lavish lifestyle." Such an allegation is relevant to scienter analysis and weighs in favor of the existence of the requisite scienter, particularly so when the representation made

by Mr. Han is one that reflects positively upon the Envion's potential value as an investment.

Viewing the totality of the factual allegations in a manner favorable to the Plaintiff, this Court believes that that Plaintiff has alleged facts that give rise to a strong inference that the requisite scienter exists in this case.  The factual allegations of the Amended Complaint give rise to a strong inference that Mr. Han was at the very least reckless in representing to Mr. Carlucci that Envion was "close" to closing the stated deal with Petrobas.  As was the case as to foregoing representations, it is conceivable that Mr. Han acted with requisite culpable scienter surpassing recklessness.  However, recklessness represents the minimum requisite scienter, and this Court believes that an adequately strong inference of it exists in this case capable of fulfilling the element of scienter.

> d.   Alleged representation that "Envion had a
> 'backlog of 2,000 orders' for its Envion Oil
> Generators

The Court finds that Plaintiff has pleaded sufficient facts to permit a reasonable belief in the falsity of Mr. Han's alleged representation that "Envion had a 'backlog of 2,000 orders' for its Envion Oil Generators."  Plaintiff's allegation that Envion has never had a system through which customers could order its Envion Oil Generators is particularly notable and calls Mr. Han's representation into severe doubt.  Contrary to

Defendants' assertion, such an allegation does represent the mere opposite of each of Mr. Han's alleged statements. (Defs. Mem. Supp. Mots. 18-19.) Rather, the contention that there did not exist any system by which customers would be even capable ordering Envion Oil Generators represents an additional substantive factual allegation that casts tremendous doubt upon the veracity of Mr. Han's representation. If Envion did not have any sort of arrangement that would enable customers to order Envion Oil Generators, then a reasonable person would be satisfied that Mr. Han, in asserting that "Envion had a 'backlog of 2,000 orders' for its Envion Oil Generators," made a false or misleading statement.

As to the second element, the Court believes that the Plaintiff has alleged facts that give rise to a strong inference of the requisite scienter. Examining the alleged facts in the light favorable to the Plaintiff, Mr. Han's repeated representations that Envion had an backlog of orders when, in fact, Envion did not have any means to receive customer orders demonstrates a strong inference that Mr. Han knowingly and intentionally misled Mr. Carlucci. Furthermore, Mr. Han's representation is congruous with his alleged motivation in inducing Mr. Carlucci's investment. Indeed, the representation that Envion had a backlog of orders would no doubt reflect positively upon the desirability of Envion's products to

customers, as well as the serve as an initial, positive benchmark of forthcoming sales revenue. Portraying Envion's potential as an investment in such a positive manner would seemingly increase the probability that Mr. Carlucci would invest in Envion, and increase likelihood that Mr. Han would acquire funds with which he would be able to continue living the "lavish lifestyle" he is alleged to have lived at the time.

Viewing the totality of the factual allegations in a manner favorable to the Plaintiff, this Court believes that that Plaintiff has alleged facts that give rise to a strong inference of the existence of the requisite scienter. At the very least, there exists a strong inference that Mr. Han acted recklessly in representing to Mr. Carlucci that Envion had a "backlog of 2,000 orders." As was the case with the foregoing representations that the Court has treated to individualized analysis, it is certainly conceivable that Mr. Han acted with culpable scienter surpassing recklessness. However, recklessness represents the minimum requisite scienter here, and this Court believes that an adequately strong inference of recklessness exists in this case capable of fulfilling the element of scienter.

> e.  Alleged representation that the $20 million would be "used exclusively" to "buy-out Mr. Han's uncle" and as "investment capital in and exclusively for the legitimate business purpose of Envion"

To be sure, Plaintiff has alleged that Mr. Han's representation as to the exclusive purposes to which his investment would be put was false or misleading. Plaintiff alleges that, instead of using Mr. Carlucci's investment for purposes related to Envion's business, Mr. Han used the investment to live a "lavish lifestyle," which included the purchase of a $3.5 million house in Florida (subsequent to having needlessly moved Envion's headquarters to the state, a move Plaintiff contends was motivated by a desire to take advantage of the Florida Homestead Exemption), and unilaterally providing himself with a salary of $5,000,000 per year at a time when Envion was insolvent or on the verge of becoming insolvent. (AC ¶ 24(c).) Plaintiff attributes to Envion former Chief Financial Officer information relating to the "lavish lifestyle" lived by Mr. Han, who allegedly who worked closely with Mr. Han and was aware of the status of Envion's business deals and finances from 2009 through early 2011. (AC ¶ 30.) Plaintiff further alleges that "Mr. Han had (and has) no profitable or financially successful employment, no known source of funds, other than the investment funds provided by Mr. Carlucci, and no profitable or financially successful deals or joint ventures with companies other than Envion." (AC ¶ 30.) Plaintiff also alleges that the "only source of funds from which Mr. Han was able to afford this lavish lifestyle was the unauthorized use of

the millions of dollars invested by Mr. Carlucci in Envion (and exclusively for Envion's legitimate business purposes)." (*Id*.) Accepting the allegations in the Amended Complaint as true for the purposes of this Motion, this Court is satisfied that Mr. Han's aforementioned representations are capable of being be proven true or false by a jury and that the alleged facts permit a reasonable belief that Mr. Han's representation was false or misleading.

As to the issue of scienter, the Amended Complaint alleges that "Mr. Han was not planning to use, and did not use, the $20,000,000 investment for any legitimate business purpose of Envion, but instead planned to use, and did use, the money for his own personal purposes ..." (AC ¶ 21.) The Amended Complaint further alleges that "Mr. Han had not used the $20,000,000 investment for any legitimate business purpose of Envion, but had instead used the money for his own personal benefit, including the purchase of a multi-million dollar home. Mr. Han unquestionably knew these representations to be false...." (AC ¶ 28.) This Court finds that these statements are essentially allegations that Mr. Han actually knew his representations to be false yet nonetheless at least recklessly represented to Mr. Carlucci that his investment would be used exclusively for purposes related to Envion. Indeed, as the person that allegedly "controls all aspects of Envion's business

endeavors, including but not limited to, all dealings with potential investors and potential business partners [and] financial records" and "person who controlled the use of the sum Mr. Carlucci invested", it is logical to impute knowledge of the expenditure of Mr. Carlucci's investment to Mr. Han. (AC ¶¶ 3, 28.) In addition, Mr. Han's motivation in inducing Mr. Carlucci to invest in Envion is compatible with the allegations in the Amended Complaint as to the manner in which Mr. Carlucci's investment was spent. Indeed, if Mr. Han's motivation in inducing Mr. Carlucci to invest was to acquire funds by which to continue to live a "lavish lifestyle," then Plaintiff's allegation that Mr. Carlucci's investment was actually used for Mr. Han's own personal benefit is certainly compatible with that motivation. Furthermore, Mr. Carlucci's attempts to audit Envion's financial records have been rebuffed by Mr. Han, a fact that has no doubt affected the Amended Complaint's ability to account for Envion's expenditures with precision and thereby track the uses to which Mr. Carlucci's investment has been put. Viewing this allegation in a manner most favorable to the Plaintiff, Mr. Han's unwillingness to allow outside inspection implies intent to suppress relevant information capable of evaluating the veracity of his representations.

Viewing the totality of the factual allegations in a manner favorable to the Plaintiff, this Court believes that that

Plaintiff has alleged facts that give rise to a strong inference of the existence of the requisite scienter.  Once again, as was the case with the foregoing representations that the Court has treated to individualized analysis, it is certainly conceivable that Mr. Han acted with culpable scienter surpassing recklessness.  However, recklessness represents the minimum requisite scienter, and this Court believes that an adequately strong inference of recklessness exists in this case capable of fulfilling the element of scienter.

### iii. Reliance

In order to sustain a private claim for securities fraud under Section 10(b), a plaintiff's reliance on the defendant's misrepresentation must have been justifiable in order for the claim to proceed. *See Ashland Inc. v. Morgan Stanley & Co., Inc.*, 652 F.3d 333, 337 (2d Cir. 2011)(citing *Harsco Corp. v. Segui*, 91 F.3d 337, 342 (2d Cir.1996)(collecting cases from various circuits). "An investor may not justifiably rely on a misrepresentation if, through minimal diligence, the investor should have discovered the truth." *Id* at 337-38 (citing *Brown v. E.F. Hutton Grp., Inc.*, 991 F.2d 1020, 1032 (2d Cir. 1993)). Factors relevant to this analysis include:

> (1) [t]he sophistication and expertise of
> the plaintiff in financial and securities
> matters; (2) the existence of longstanding
> business or personal relationships; (3)
> access to the relevant information; (4) the

existence of a fiduciary relationship; (5)
concealment of the fraud; (6) the
opportunity to detect the fraud; (7) whether
the plaintiff initiated the stock
transaction or sought to expedite the
transaction; and (8) the generality or
specificity of the misrepresentations.

*Id.*

In its previous Memorandum Opinion, this Court has

already stated that reliance is a fact-intensive question and

generally inappropriate for determination on a motion to

dismiss. (Mem. Op. 53, n. 2.) Defendants have cited a number

of legally and factually diverse cases with a single unifying

feature: that they are indicative of the fact that reliance is

an issue capable of being dispositive at the Motion to Dismiss

stage.[24] To be sure, the Court is well-aware of the dispositive

capability of this issue. However, as this Court and others

have previously stated, reliance is a fact-intensive inquiry,

and the Court will not unduly forego restraint at this

preliminary stage. *See*, *e.g.*, *Arnlund v. Smith*, 210 F.Supp.2d

---

[24]The Court finds Defendants' contention that Mr. Han's representations were
tantamount to "oral promise[s]" and that reliance was *per* se unreasonable to
be unavailing. Defendants rely on *D & G Flooring, LLC v. Home Depot U.S.A.*,
*Inc.*, 346 F. Supp. 2d 818 (D.Md. 2004), a case in in which Plaintiff D & G
relied on Home Depot's oral promise to make D & G the exclusive installer for
Home Depot in the Baltimore market. The court in that case found D & G's
reliance on the oral promise to be unreasonable within the context of a claim
for promissory estoppel. Additionally, the alleged oral promise directly
contradicted the terms of a writing executed the same day. Defendants
further rely on *RCM Supply Co., Inc. v. Hunter Douglas, Inc.*, 686 F.2d 1074,
1075 (4th Cir. 1982), a case on appeal and reversed from a grant of summary
judgment as to promissory estoppel. Those cases are factually
distinguishable. Furthermore, to establish a *per se* rule as to oral
representations within federal securities law would undermine the point of
undertaking a contextual analysis, and this Court declines to do so.

755, 769 (E.D.Va. 2002). To be sure, Plaintiff had pleaded reliance as a general matter in their Amended Complaint, and repeatedly alleges that such reliance was reasonable and justified. (AC ¶¶ 16, 17, 23, 29, 53, 54, 61, 66, 70.) Having alleged actual reliance as a general matter, the remaining inquiry pertains to whether Mr. Carlucci's reliance was justifiable. Defendants contend that it was not. Considering the factual allegations of the Amended Complaint in a light most favorable to the Plaintiff, this Court believes issues of fact remain as to the disposition of this issue, and finds that whether Mr. Carlucci's reliance was justifiable is an issue inappropriate that is inappropriate to decide as a matter of law on the present Motion to Dismiss.

Addressing the issue of whether Mr. Carlucci is a "sophisticated investor," this Court will not commit itself to a position on this factual issue when little substantive evidence exists in the record as to Mr. Carlucci's sophistication as to the financial and intellectual property matters pertinent to this case. In their Reply to Plaintiff's Opposition, Defendants have submitted but a single corporate shareholder publication that includes a brief overview of Mr. Carlucci's *curriculum vitae*, amounting to no more than a paragraph of unsourced biographical information. If Defendants wish to rely upon Mr. Carlucci's biography and work history as dispositive of this

analytical factor, then additional evidence beyond a single
corporate shareholder publication is necessary. The present
submission neither disposes of the issue of Mr. Carlucci's
sophistication, nor reliance within the context of the instant
securities action, which entails an eight-factor analysis in its
entirety.

Regarding Mr. Carlucci's access to relevant
information capable of disproving the representations made by
Mr. Han, particularly those relating to Envion's patent
ownership, Defendants assert that a search of the Patent and
Trademark Office database would have revealed that "Envion did
not own any patents for its technology." Although this
contention may ultimately have some merit as to the proprietary
status of the technology within the United States, Defendants
have repeatedly argued that the absence of a patent within the
United States does not necessarily mean that they did not own a
patent to the technology elsewhere. Under the logic of the
latter assertion, simply searching the United States patent
database would not have revealed that "Envion did not own any
patents for its technology." These arguments are inconsistent
as to the issue of whether a reasonable investigation would have
revealed Envion's lack of patent ownership. Mr. Carlucci surely
cannot be expected to search every patent database worldwide,

within the course of a reasonable investigation, in order to determine the veracity of Mr. Han's representation.

Furthermore, it is not clear that reasonable inquiry would have yielded the relevant information as to the remaining alleged misrepresentations. Plaintiff alleges that upon learning of information causing him to doubt the veracity of the representations made by Mr. Han, Mr. Carlucci requested that Mr. Han allow an accountant to audit Envion's books, records, and intellectual property. (AC ¶ 40.) Mr. Han allegedly refused. Plaintiff further alleges that, to date, Mr. Han has not given Mr. Carlucci access to Envion's books, records, or intellectual property when it has been requested. (*Id.*) At best, the issue of whether Mr. Carlucci's had access to the relevant information is in dispute. Furthermore, again viewing the factual allegations in a manner most favorable to the Plaintiff, Mr. Han's unwillingness to yield access to documents and records that constitute likely sources of the relevant information seemingly bespeaks an attempt to conceal that information from Mr. Carlucci.

As to Defendants' contention that Mr. Carlucci was "on notice" to investigate Defendants' fraudulent conduct, and that "red flags" that should have caused Mr. Carlucci to investigate, the Court finds this argument unavailing. "[A] sophisticated investor is not barred by reliance upon the honesty of those

with whom he deals in the absence of knowledge that the trust is misplaced. Integrity is still the mainstay of commerce...." *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 883 (3d Cir. 2000).

The Court will not belabor this issue further. Viewing the factual allegations of the Amended Complaint in a light most favorable to the Plaintiff permits a reasonable belief that Mr. Carlucci could have justifiably relied upon the representations of Mr. Han.  Many of the elements of the eight-factor analysis are disputed by the parties and, consequently, this Court finds that this fact-intensive inquiry constitutes an issue inappropriate to be decided as a matter of law at this stage in the proceedings.

## 2. Virginia Securities Fraud

In Count II, Plaintiff has alleged securities fraud in violation of the Virginia Securities Act, Va. Code § 13.1-501, *et seq.*  In their Motion to Dismiss, Defendant alleges that Plaintiff has failed to adequately plead loss causation, falsity, and scienter.  While the PSLRA does not apply to this claim, it must be pled with particularity under Rule 9(b).

Section 13.1-502 prohibits selling securities by means of an untrue statement or omission of a material fact.[25]  Section

---

[25] Section 13.1-502 makes it unlawful, in the offer or sale of any securities, to "obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the

13.1-522(A) creates civil liability for the sale of a security by means of such an untrue statement or omission.[26] To state a claim under the Virginia Securities Act, a plaintiff must plead a material misrepresentation.[27]

### i. Falsity

As to Defendants' contention that the Amended Complaint fails to allege falsity adequately, this Court found in its foregoing analysis that Plaintiff has adequately pleaded this element. Consequently, this Court finds that it has been adequately pleaded here as well.

### ii. Loss Causation

Although Defendants allege that Plaintiff has failed to adequately plead loss causation, this Court is unable to construe loss causation as a requirement to state a claim under the Virginia Securities Act. This Court finds the Fourth Circuit's analysis of this issue in *Dunn v. Borta* instructive in this regard. *See Dunn*, 369 F.3d at 432-33 ("Defendants also maintain on appeal that ... the Act should be construed as

---

statements made, in the light of the circumstances under which they were made, not misleading...." Va.Code Ann. § 13.1-502.

[26] Section 13.1-522(A) provides that "[a]ny person who: (i) sells a security in violation of § [ ] 13.1-502 ..., or (ii) sells a security by means of an untrue statement of a material fact or any omission to state a material fact necessary in order to make the statement made, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission) ... shall be liable...." Va.Code Ann. § 13.1-522(A).

[27] Scienter, reliance, and causation are not required elements of a Virginia Securities Act claim. *See Dunn*, 369 F.3d at 432; *Diaz Vicente*, 736 F. Supp. at 694; *Tanner v. State Corp. Comm'n*, 265 Va. 148, 158 (Va. 2003)

requiring both reliance and causation, which the Complaint does not allege ... [W]e are unable to construe the Act as requiring these elements.")  Furthermore, this Court noted in its Memorandum Opinion on Defendants' first Motion to Dismiss that causation is not a required element of a Virginia Securities Act claim.

### iii.  Scienter

Similarly, as this Court noted in its Memorandum Opinion on Defendants' first Motion to Dismiss, scienter is not a required element of a Virginia Securities Act claim.  This comports with existent Virginia case law as to the proper interpretation of the Virginia Securities Act.  *See, e.g., Tanner*, 265 Va. at 157-58.

### 3. Actual Fraud

In Count III, Plaintiff has alleged actual fraud under the Virginia common law.  In their Motion to Dismiss, Defendants allege that Plaintiff has failed to adequately plead loss causation, reasonable reliance, falsity, and scienter.  While the PSLRA does not apply to this claim, it must be pled with particularity under Rule 9(b).

In Virginia, the elements of a state law fraud claim are essentially the same as those necessary to establish a Section 10(b) claim, except that fraud must ultimately be proved by clear and convincing evidence.  *Arabian v. Bowen*, 966 F.2d

1441, 1992 WL 154026, at *5 (4th Cir. 1992)(unpublished table decision).  A plaintiff asserting a claim of actual fraud must demonstrate (1) a false representation by the defendant, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the misled party, and (6) resulting injury to the party misled.  *See Diaz Vicente v. Obenauer*, 736 F. Supp. 679, 690 (E.D.Va. 1990).

Additionally, under Virginia law, a concealment or omission of a material fact may also give rise to a claim of actual fraud.  *Bank of Montreal v. Signet Bank*, 193 F.3d 818, 826 (4th Cir. 1999).  Although silence does not constitute fraud in the absence of a duty to disclose, a duty to disclose may arise where "[c]oncealment of a material fact by one who knows that the other party is acting upon the assumption that the fact does not exist constitutes actionable fraud," *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 629 (4th Cir. 1999)(citing *Allen Realty Corp. v. Holbert*, 227 Va. 441, 318 S.E.2d 592, 597 (Va. 1984)); *White v. Potocska*, 589 F.Supp.2d 631, 642 (E.D.Va. 2008). For purposes of an action for fraud, concealment, whether by word or conduct, may be the equivalent of a false representation because it always involves deliberate nondisclosure designed to prevent another from learning the truth.  Fraud by concealment requires actual intent to conceal a fact.  Reckless non-disclosure is not actionable.  *White*, 589 F.

Supp. 2d at 642. Furthermore, a party's willful nondisclosure of a material fact that he knows is unknown to the other party may evince intent to practice actual fraud. *Id* (citing *Van Deusen v. Snead*, 247 Va. 324, 441 S.E.2d 207, 209 (Va. 1994)).

### i. Falsity

Touching once again upon Defendants' contention that the Amended Complaint fails to allege falsity adequately, this Court held in the foregoing that Plaintiff has adequately pleaded this element. Consequently, this Court finds that it has been adequately pleaded here as well.

### ii. Scienter

Regarding the issue of scienter as it relates to the first four representations of Mr. Han discussed by the Court in its foregoing analysis of federal law, this Court has found that the factual allegations of the Amended Complaint give rise to a strong inference that Mr. Han, at a minimum, was reckless in misrepresenting to Mr. Carlucci the state of Envion's business, the extent of its intellectual property holdings, and the true nature of company's dealings with other corporate entities.[28] This Court also believes that the allegations of the Amended Complaint sufficiently support Plaintiff's allegation that Mr. Han made those misrepresentations intentionally and knowingly

---

[28] Specifically, the representations that Envion had the exclusive patent for the Envion Oil Generator, that Envion had a "done deal" with Gazprom, that that Envion was "close" to closing a deal with Petrobas, and that "Envion had a 'backlog of 2,000 orders' for its Envion Oil Generators.

for the purposes of pleading a claim for actual fraud. As to each of the representations, the Amended Complaint alleges that "Mr. Han knowingly made numerous material representations and numerous material misrepresentations and omissions of material fact in his disclosures to Mr. Carlucci in connection with his attempt to induce Mr. Carlucci to invest in Envion." (AC ¶ 14.) Indeed, the Amended Complaint alleges that requisite scienter existed and, as the Court has previously engaged in protracted factual analysis, it will not belabor the same issues within the context of actual fraud except to state that the factual allegations adequately demonstrate the requisite scienter. (AC ¶¶ 20, 51(c), 64.) Considering the facts of the Amended Complaint in a manner most favorable to the Plaintiff, this Court finds that the alleged facts demonstrate the requisite scienter as to those four representations.

Regarding the alleged representation that the $20 million would be "used exclusively" to "buy-out Mr. Han's uncle" and as "investment capital in and exclusively for the legitimate business purpose of Envion," fraud generally "must relate to a present or pre-existing fact, and cannot ordinarily be predicated on unfulfilled promises or statements as to future events." *Patrick v. Summers*, 235 Va. 452, 454 (1988). However, if a defendant makes a promise that, when made, he has no intention of performing, that promise is considered a

misrepresentation of present fact and may form the basis for a claim of actual fraud. *Supervalu, Inc. v. Johnson*, 276 Va. 356, 360 (2008)(citations omitted). Viewing the allegations of the Amended Complaint in a light most favorable to the Plaintiff, the Amended Complaint does in fact allege that Mr. Han had no intention of performing. Indeed, the Amended Complaint alleges that "Mr. Han was not planning to use, and did not use, the $20,000,000 investment for any legitimate business purpose of Envion, but instead planned to use, and did use, the money for his own personal purposes..." (AC ¶ 21.) Accepting the allegations of the Amended Complaint as true for the purposes of the present Motion to Dismiss, this Court finds that the requisite strong inference of scienter exists as to this representation.

      iii.  <u>Reliance</u>

Defendants further contend that Plaintiff has failed to adequately plead reasonable reliance. To be sure, Plaintiff has pleaded actual reliance, and the remaining inquiry entails only the determination of whether Mr. Carlucci's reliance was reasonable. Plaintiff repeatedly contends that Mr. Carlucci's reliance was reasonable. (AC ¶¶ 16, 17, 23, 29, 53, 54, 61, 66, 70.)

"In order to prove reliance, a plaintiff must demonstrate that its reliance upon the representation was

reasonable and justified." *Hitachi,* 166 F.3d at 629 (quoting *Meridian Title Ins. Co. v. Lilly Homes, Inc.*, 735 F.Supp. 182, 185 (E.D.Va. 1990), *aff'd*, 934 F.2d 319, 1991 WL 93059 (4th Cir. 1991)). As the Fourth Circuit stated in *Hitachi*, "the touchstone of reasonableness is prudent investigation. A plaintiff cannot claim that its reliance was reasonable and justified when it makes a partial inquiry, with full opportunity of complete investigation, and elects to act upon the knowledge obtained from the partial inquiry." *Id* (citing *Harris v. Dunham*, 203 Va. 760, 127 S.E.2d 65, 71-72 (Va. 1962)). However, the Fourth Circuit also noted that "the cases in Virginia are clear, however, that "one cannot, by fraud and deceit, induce another to enter into a contract to his disadvantage, then escape liability by saying that the party to whom the misrepresentation was made was negligent in failing to learn the truth." *Id* (citing *Nationwide Ins. Co. v. Patterson*, 229 Va. 627, 331 S.E.2d 490, 492 (Va. 1985). As this Court noted in its Memorandum Opinion on Defendants' first Motion to Dismiss, as well as in its foregoing analysis of reliance within the context of Plaintiff's federal claim, reliance is a fact-intensive inquiry that is usually inappropriate for a motion to dismiss. As this Court has noted, This Court will not transform the present Motion to Dismiss into a motion for summary judgment.

      iv.  <u>Loss Causation</u>

Finally, as to the issue of loss causation, this Court has already engaged in protracted analysis and will not belabor the issue of loss causation where it is unnecessary. As this Court has stated in its foregoing analysis of this issue within the context of federal law, Plaintiff has sufficiently alleged that Mr. Han's repeated misrepresentations in the inducement of Mr. Carlucci's investment proximately cause of his subsequent loss.

### 4. Constructive Fraud

In Count IV, Plaintiff has alleged constructive fraud in violation of the Virginia common law. In their Motion to Dismiss, Defendant alleges that Plaintiff has failed to adequately plead loss causation, reasonable reliance, falsity, and scienter. While the PSLRA does not apply to this claim, it must be pled with particularity under Rule 9(b).

In Virginia, the elements of a claim for constructive fraud are identical to those for actual fraud, except for the intent element. *Design & Prod., Inc. v. Am. Exhibitions, Inc.*, 820 F.Supp.2d 727, 742 (E.D.Va. 2011). To plead a claim for constructive fraud, a plaintiff must show "that a false representation of a material fact was made innocently or negligently...." *Schmidt v. Wells Fargo Home Mortg.*, No. 3:11-cv-059, 2011 WL 1597658, at *5 (E.D.Va. 2011)(quoting *Mortarino v. Consultant Eng'g Servs., Inc.*, 251 Va. 289, 295 (Va. 1996)).

As the only element of the present analysis of Plaintiff's constructive fraud claim that differs from those of actual fraud is the intent element, the Court will confine its analysis to that particular issue.

As constructive fraud entails an intent standard of having made the false representation innocently or negligently, a pleading standard beneath what is required under the foregoing claims that this Court has been to have been sufficiently pleaded, this Court is satisfied that the applicable standard for pleading the requisite intent for constructive fraud has been met here. Consequently, this Court is satisfied that Plaintiff has adequately pleaded the requisite elements of constructive fraud as to the representations made by Mr. Han as to the state of Envion's business, the extent of its intellectual property holdings, and the true nature of company's dealings with other corporate entities.[29]

However, regarding Mr. Han's alleged representation that Mr. Carlucci's $20 million investment would be "used exclusively" to "buy-out Mr. Han's uncle" and as "investment capital in and exclusively for the legitimate business purpose of Envion," it is axiomatic in Virginia that "[u]nder no circumstances ... will a promise of future action support a

---

[29] Specifically, the representations that Envion had the exclusive patent for the Envion Oil Generator, that Envion had a "done deal" with Gazprom, that that Envion was "close" to closing a deal with Petrobas, and that "Envion had a 'backlog of 2,000 orders' for its Envion Oil Generators.

claim of constructive fraud." *Supervalu*, 276 Va. at 360.

However, if a defendant makes a promise that, when made, he has

no intention of performing, that promise is considered a

misrepresentation of present fact and may form the basis for a

claim of actual fraud. *Id.* Under these circumstances, Mr.

Han's representation as to the purposes for which Mr. Carlucci's

investment would be used is not actionable in a claim for

constructive fraud.

## IV. Conclusion

For the foregoing reasons, the Court rules as follows:

(1) Defendants' Motion to Strike is granted as to the

following representations:

(a) that Mr. Han had communicated with
numerous investors who were interested in
investing with Envion, including Warren
Buffet, Bill Gates, Dow Chemical, Morgan
Stanley, and Goldman Sachs;

(b) that former President Bill Clinton
had agreed to become affiliated with Envion,
possibly as a member of its board of
directors, and that former President George
W. Bush was interest in investing in Envion;

(c) that along with Han, Envion was run
by a number of seasoned and highly regarded
executives with extensive track records of
success in the energy, technology, and
finance industries, as well as the public
sector; and

(d) that Envion would be the best
return Mr. Carlucci had received on any
investment, that Mr. Carlucci would get his
investment back in three weeks, and that Mr.

Carlucci would receive possibly up to 50
times the amount invested.


(2)   Defendants' Motion to Dismiss Plaintiff's Claim
of Federal Securities Fraud Against All Defendants (Count I) is
denied;

(3)   Defendants' Motion to Dismiss Plaintiff's Claim
of Virginia Securities Fraud Against All Defendants (Count II)
is denied;

(4)   Defendants' Motion to Dismiss Plaintiff's Claim
of Actual Fraud Against All Defendants (Count III) is denied;
and

(5)   Defendants' Motion to Dismiss Plaintiff's Claim
of Constructive Fraud Against All Defendants (Count IV) is
denied.

An appropriate Order will issue.



                                    /s/
_____
November 1, 2012              James C. Cacheris
Alexandria, Virginia    UNITED STATES DISTRICT COURT JUDGE